EXHIBIT E

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043



CENTERS FOR MEDICARE & MEDICAID SERVICES

**Office of the Attorney Advisor**

DEC – 2 2015

## CERTIFIED MAIL

Stephanie A. Webster, Esquire
Akin, Gump, Strauss, Hauer & Feld LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036-1564

Re:  Allina Health Services, et al., Civil Nos. 1:10-cv-01463, 1:12-cv-00328

Dear Ms. Webster:

Enclosed is a copy of the Administrator's decision issued in accordance with the court ordered

remand.  This constitutes the final administrative decision of the Secretary of Health and Human

Services.

Sincerely yours,

Jacqueline R. Vaughn
Attorney Advisor

Enclosure

cc:  Wilson Leong, CPA, Intermediary's Representative

# CENTERS FOR MEDICARE & MEDICAID SERVICES

### *Decision of the Administrator*

In the case of:

**ALLINA HEALTH SERVICES, *et.al.*,**

     **Plaintiff**

**vs.**

**SYLVIA M. BURWELL,**    Civil Nos. 1:10-cv-01463
**SECRETARY, DEPARTMENT OF**       1:12-cv-00328
**HEALTH AND HUMAN SERVICES**

     **Defendant**

---

This case is before the Administrator, Centers for Medicare & Medicaid Service (CMS), by order dated April 1, 2014, from the United States Court of Appeals for the District of Columbia Circuit.

## Background

Pursuant to a court ordered remand, the case is now before the Administrator for a determination, in the absence of the vacated "2004 rule", of the appropriate statutory interpretation to be used to calculate the Providers' disproportionate share hospital (DSH) adjustment payment with respect to the treatment of the inpatient hospital Medicare Part C days for Federal fiscal year (FFY) 2007. The specific issue is whether enrollees in Medicare Part C[1] are "entitled to benefits" under Part A, as that phrase is used at section 1886(d)(5)(F)(vi)(I) of the Social Security Act, and, therefore, whether these days should be counted in the numerator and denominator of the "Medicare fraction"[2] of the DSH

---

[1]  Medicare Part C was previously referred to as Medicare + Choice (M+C) now known as the Medicare Advantage (MA) or Part C.
[2]  This fraction is also referred to as the Medicare/supplemental security income fraction (Medicare/SSI) fraction and the SSI ratio.

adjustment, or whether enrollees in Medicare Part C are "not entitled to benefits under Part A", as that phrase is used at section 1886(d)(5)(F))(vi)(II) of the Act and, therefore, whether these days should be included in the numerator of the "Medicaid fraction" of the DSH adjustment.[3]

In the May 19, 2003, Federal fiscal year (FFY) 2004 inpatient prospective payment system (IPPS) proposed rule,[4] CMS proposed that Part C days should not be included in the Medicare fraction denominator and should be included in the Medicaid fraction numerator if the patient was Medicaid eligible and that the days would also continue to be included in the Medicaid fraction denominator as part of total patient days.   However, in the FFY 2005 IPPS final rule (August 11, 2004)[5] (also referred to as the "2004 Rule"),[6] CMS did not adopt the May 19, 2003 proposal to include the days associated with Part A beneficiaries in the Medicaid fraction. Instead, CMS adopted the policy to include the patient days for Part C beneficiaries in the Medicare/SSI fraction and exclude them from the Medicaid fraction. CMS subsequently issued a technical correction in the FFY 2008 IPPS final rule, dated August 22, 2007,[7] because CMS inadvertently did not change the text in the regulation text of the FFY 2005 final IPPS rule at 42 C.F.R. §412.106(b)(2)(i), which discusses the numerator of the Medicare fraction to incorporate this change. In the FFY 2005 final IPPS rule, CMS also inadvertently did not change the text of 42 C.F.R. §412.106(b)(2)(iii), which discusses the denominator of the Medicare fraction. Consequently, CMS amended the regulatory text in the FFY 2008 rule with respect to both the numerator and denominator of the Medicare fraction of the Medicare disproportionate patient percentage to reflect the stated policy.

The Providers appealed to the Provider Reimbursement Review Board (Board). In PRRB Decision No. 2010-D38 and the other related cases, the Board respectively granted expedited judicial review (EJR) regarding the "2004 rule."[8]   The United States District

---

[3]  The issue of whether the days should be included in the denominator of the Medicaid fraction is not in dispute as the denominator of the fraction involves "the total number of the hospital patient days" (i.e., Medicare, Medicaid and other inpatients days).

[4]  68 Fed. Reg. 27154, 27208 (May 19, 2003).

[5]  69 Fed. Reg. 48916, 49099 (August 19, 2004).

[6]  *Allina Health Services v. Sebelius,* 746 F.3d. 1102, 1107 (D.C. Cir. 2014).

[7]  72 Fed. Reg. 47130, 47384 (          )

[8] *Allina Health Service v. Sebelius.* Civil Action No. 1:10-cv-01463  (PRRB CASE NAMES:  King & Spalding Inclusion of Medicare Advantage Days in 2007 SSI Ratios Group/Shands HealthCare Inclusion of Medicare Advantage Days in 2007 SSI Ratios Group/NorthShore-Long Island Jewish HS Inclusion of Medicare Advantage Days in 2007 SSI Ratios Group(PRRB Decision No. 2010-D38, PRRB Case Nos. 10-0165G; 10-0162GC; 10-0169GC(;   Allina Health System 2007 Inclusion of MA Days in SSI Ratios CIRP Group, (PRRB Case No. 10-0155GC);   University of Rochester Medical Center 2007 Inclusion of Medicare Advantage Days,(PRRB Case No. 10-0158GC);   Methodist Health System FFY 2007 Inclusion of Medicare Advantage Days SSI Ratio Group II, (PRRB Case No. 10-1155GC); *Florida Health Sciences Center, v. Sebeluis.* Civil Action No. 1:12-cv-00328 (PRRB CASE NAMES: Henry Ford Hospital (PRRB Case No. 11-0746); Tampa General Hospital (PRRB Case No. 11-0841).

Court for the District of Columbia granted a motion for summary judgment in favor of the Providers concluding that the Rule was not a "logical outgrowth" of the proposed rule and that it lacked a reasoned explanation.[9]   The Court vacated those portions of the 2004 Rule that applied to the DSH percentage calculation and remanded the case to the Secretary. The Secretary appealed the decision to the Court of Appeals for the District of Columbia. On appeal, the Secretary argued that the Rule was procedurally valid and that, even if the court were to determine that it was not valid, the Providers were not entitled to any specific relief as to the manner of the calculation of their FY) 2007 payments, because the Secretary could reach the same interpretation of the statute on remand, even in the absence of the Rule.

The Court of Appeals for the District of Columbia, in *Allina Health Services v. Sebelius*, 746 F.3d. 1102 (D.C. Cir. 2014), held that the Secretary did not provide adequate notice and opportunity to comment before promulgating the FFY 2005 IPPS rule, and so affirmed the portion of the district court's opinion vacating the rule. The Court of Appeals ruled that the District Court improperly ordered the Secretary to recalculate DSH payments to include the Part C days in the numerator of the Medicaid fraction, holding that the agency was free to decide "how to resolve the problem."   Accordingly, the case was remanded to the Secretary to determine whether patient days for Part C patients should be counted in the Medicare fraction of the Disproportionate Patient Percentage for the hospitals at issue in FY 2007 or the numerator of the Medicaid fraction.

<div align="center">Comments</div>

The Center for Medicare (CM) commented, requesting that the Administrator find that the days associated with Part C patients should be included in the Medicare/Social Security Income (SSI) ratio of the disproportionate patient percentage for the hospitals at issue.[10] CM stated that individuals enrolled in Part C plans are "entitled to benefits" under Medicare Part A.   CM pointed out that beneficiaries who are enrolled in Part C plans provided under Medicare Part C continue to meet all of the statutory criteria for entitlement to Part A benefits under section 226 of the Social Security Act.   In order to enroll in Medicare Part C, a beneficiary must be "entitled to benefits under Part A and enrolled in Part B."   Once a beneficiary enrolls in Part C, the MA plan must provide the

---

[9] *Allina Health Servs. v. Sebelius*, 904 F. Supp. 2d 75, 95 (D.D.C. 2012).
[10] CM stated that the Providers in this case are: Abbott Northwestern Hospital, Inc., Cambridge Medical Center, Forest Hills Hospital, Franklin Hospital, Henry Ford Hospital, Highland Hospital, Kaleida Hospital, Kingsbrook Jewish Medical Center, Long Island Jewish Medical Center, Lutheran Medical Center, Maimonides Medical Center, Montefiore Medical Center, Mount Sinai Medical Center, New York Hospital Medical Center of Queens, New York Methodist Hospital, New York Presbyterian Hospital North Carolina Baptist Hospital, North Shore University Hospital, Owatonna Hospital, Shands Hospital at the University of Florida, Shands Jacksonville Medical Center, Southside Hospital, Staten Island University Hospital, Strong Memorial Hospital, Tampa General Hospital, United Hospital, and Unity Hospital.

<div align="center">3</div>

beneficiary with the benefits to which the enrollee is entitled under Medicare Part A, even though it may also provide for additional supplemental benefits.   Finally, under certain circumstances, Medicare Part A pays for care furnished to patients enrolled in Part C plans.   For example, if, during the course of the year, the scope of benefits provided under Medicare Part A expands beyond a certain cost threshold, due to Congressional action or a national coverage determination, Medicare Part A will pay the provider for the cost of those services directly.[11]   Thus, CMS stated that a patient enrolled in a Part C plan remains "entitled to benefits" under Medicare Part A, and should be counted in the Medicare fraction of the DSH patient percentage, and not the Medicaid fraction.

The Providers' contended that CMS cannot treat this issue as if on a "clean slate" as they alleged that the Court of Appeals for the D.C. Circuit has twice affirmed that CMS' policy before the 2004 rulemaking was to exclude Part C days from the Part A/SSI fraction and include those days in the Medicaid fraction.

The Providers alleged that because this issue has been previously addressed by the D.C. Circuit Court in two separate holdings and, since the 2004 rulemaking has been vacated, the prior policy is restored and now governs the Providers' DSH adjustments for cost years beginning in federal fiscal year (FFY) 2007. The Providers point to the D.C. Circuit Court of Appeal's holdings in *Northeast Hospital v. Sebelius*, 657 F.3d (D.C. Cir. 2010) and *Allina Health Services v. Sebelius*, 746 F. 3d 1102 (D.C. Cir. 2014) as establishing that pre-2004 CMS policy treated Part C patients as not entitled to benefits under Part A. The Providers contended that the D.C. Circuit held prior to 2004 the agency had a longstanding policy of "excluding part C days from the part a/SSI fraction and including them in the Medicaid fraction (if Medicaid eligible)." Accordingly, the Providers contended that the policy of treating Part C days as non-part A days was restored by the vacatur and governs this appeal.

The Providers asserted that CMS does not have the authority to alter the alleged, presently governing, pre-2004 policy. The Providers claimed that the Court in the vacating decision, declined the opportunity to decide the issue on how to reverse the alleged longstanding policy for the agency and, accordingly, the Medicare Act and Administrative Procedure Act (APA) governs how the agency should handle the issue. The Providers state that the Medicare Act and the APA preclude the Secretary from altering the, alleged, currently governing regulation and policy of treating Part C patients as non- Part A entitled without notice and comment rulemaking.   The Providers asserted that the Medicare Act prescribes that when a final Medicare rule is not the logical outgrowth of a proposed rule that it "shall be treated as a proposed regulation and shall not take effect until there is the further opportunity for public comment and a publication of the provision again as a final

---

[11]   *See,* Section 1852 of the Social Security Act.

regulation."[12] The Providers asserted that the Medicare Act mandates that "[n]o rule, requirement, or other statement of policy….that establishes or changes a substantive legal standard governing…the payment for services…shall take effect unless it is promulgated by the Secretary by regulation."[13] The Providers insisted that the Secretary is using this remand as an ad-hoc method to make policy alterations as opposed to using the methods intended by the Medicare Act. The Providers also pointed to the Administrative Procedure Act (APA) as precluding the Secretary's actions. The Secretary would be bound by the APA to follow the notice and comment rulemaking process in order to change the "pre-2004 DSH regulation." The Providers maintained that the prior interpretation of pursuant to the pre-2004 regulation of the DSH statute was definitive and that the Secretary's treatment would be a significant revision.[14]

The Providers explained that the pre-2004 regulation required the inclusion of the days at issue in the Medicaid fraction. The Provider alleged that when the rule was adopted the regulation mandated that only "covered" Part A inpatient days were included in the Part A/SSI fraction and Part C days are not "covered days."   The Providers contended that the basic formula in effect, just prior to the 2004 rulemaking at issue in these appeals, defined the numerator of the Part A/SSI fraction as including "the number of covered patient days that … [a]re furnished to patients who … were entitled to both Medicare Part A and SSI"). Part C patients do not receive benefits under Part A, but rather, they receive benefits under Part C. Through fiscal year 2004, the Secretary treated Part C patients as not "entitled to benefits" under Part A.   Because Part C days were not "covered patient days … furnished to patients who … were entitled to ..." Medicare Part A, the regulation and the Secretary's interpretation excluded these days from the Part A/SSI fraction and required their inclusion in the Medicaid fraction.

Relating to the foregoing arguments, the Providers alleged that the original pre-2004 regulation prohibited the agency from treating any Part A entitled day not paid under Part A and therefore precluded the treatment of Part C days as Part A days as the payment is made by a private Part C plan for services furnished to their Part C patients and not made under the Medicare Part A fee for service program. The Providers stated that the amended regulation addition of and use of the phrase "or Medicare Advantage (Part C)" means they were not previously included and as CMS had definitively interpreted the DSH to exclude them from the Part A/SSI fraction regulation, CMS may not change the interpretation through this adjudication without notice and comment rulemaking as it would involve a significant revision. This interpretation was also embodied in numerous instructions and

---

[12] 42 U.S.C. §1395hh(a)(4)

[13] 42 U.S.C. §1395hh(a)(2)

[14] See *Mrtg. Bankers Ass'n v. Harris*, 720 F. 3d 966, 969 (D.C. Cir. 2013)(an agency is barred from altering its interpretation of a regulation except through notice and comment rulemaking if that interpretation is "definitive" and the alteration is a "significant revision.")

guidance noted by the court in Northeast that nonteaching hospitals were not to file no pay bills that would have been necessary to count Part C days and conveying that only "covered" Part A days were to be included. It also reflected the Secretary's longstanding practice according to the record in *Baystate.Medical Center v. Leavitt*, 587 F.Supp.2d 37 (D.C.D.C. 2008).

The Providers also alleged that, in addition to the regulation, CMS' longstanding policy, prior to the 2004 final rule, was to exclude Part C days in the Medicare fraction. The Providers alleged that CMS included those days in the Medicaid fraction. To support this position, the Providers cited language in the May 2003 proposed rule for Federal fiscal year where the Secretary stated that "[t]hese ... days should be included in the count of total patient days in the Medicaid fraction (the denominator), and the patient's days for [a Part C] beneficiary who is also eligible for Medicaid would be included in the numerator of the Medicaid fraction." The Secretary explained that "once a beneficiary has elected to join [a Part C] plan, that beneficiary's benefits are no longer administered under Part A."

Furthermore, even after the 2004 final rule CMS did not make the change to the regulation referred to in the 2004 preamble until 2007. Instead, when CMS initially transmitted the Part A/SSI fractions for FFY 2005 and 2006, those fractions continued to exclude Part C days, which the Providers alleged was consistent with the CMS' un-amended regulatory text throughout those fiscal years and they alleged it was CMS' longstanding policy before the 2004 rulemaking.[15]

The Providers also claimed that CMS' pre-remand decision to treat Part C days as Part A days, as reflected in an announcement of the 2012 fractions made well before this proceeding, is inconsistent with congressional intent. That intent was to reimburse hospitals for higher costs per Part A case due to the higher costs of treating low-income patients whose care was paid for under Part A, and the higher costs incurred by treating low-income patients outside of the Part A payment system. The Providers contended that including Part C patients in the Part A/SSI fraction, even though their care is not reimbursed through the Part A inpatient prospective payment system, thwarts Congresses' intent and unlawfully dilutes the Part A/SSI fraction. Treating patients, who are enrolled in Part C as "entitled" to benefits under Part A, even though those patients are not entitled to receive payment of Part A benefits is inconsistent with the Secretary's interpretation of the word "entitled" in the very same sentence to mean entitled to payment of social security benefits.

---

[15] The Providers stated that, not until July 2007, did CMS issue a revision to the Medicare Claims Processing Manual, with a "purported 'effective date' of October 1, 2006," i.e., retroactive to the beginning of fiscal year 2007, that permitted hospitals to submit the data necessary to implement the new policy regarding Part C days

Even if CMS had that authority, congressional intent, the public interest, and the equities all demand that patients whose care is paid by Part C, cannot be considered "entitled to benefits" under Part A for purposes of the disproportionate share hospital adjustment to Part A prospective payment per discharge. The Providers contended that the treatment of Part C days as Part A days, for the Providers and the cost years at issue, is contrary to public policy and the public interest.  Because Part C patients have to pay Part B premiums in order to enroll in Part C, they tend to be wealthier than the Part A population and therefore the Part C "population differs from the Part A [fee-for-service] patient population" as part C patients are less likely than Part A patients to be low income and qualify for SSI benefits.   Their inclusion in the Part A/SSI fraction eliminates hundreds of millions of dollars of Medicare reimbursement from safety-net hospitals per year, leaving them inadequately reimbursed in light of the higher costs incurred in treating low-income patient populations, and hampering their ability to provide such care. Therefore, for the reasons stated above, CMS cannot treat Part C days as "entitled to benefits" under Part A in the Medicare DSH calculation. Further, the Providers reasonably made spending forecasts based on the Pre-2004 regulation and policy and were not able to conduct advanced modeling of the effect of the agency's intended change.

## Discussion

The entire record has been examined, including all correspondence, position papers, and exhibits.   All comments received timely are included in the record and have been considered.

## I.     The Medicaid Program

Relevant to the issue involved in this case, two Federal programs, Medicaid and Medicare involve the provision of health care services to certain distinct patient populations.   The Medicaid program is a cooperative Federal-State program that provides health care to indigent persons who are aged, blind or disabled or members of families with dependent children.[16]   The program is jointly financed by the Federal and State governments and administered by the States according to Federal guidelines.   Medicaid, under Title XIX of the Social Security Act, establishes two eligibility groups for medical assistance: categorically needy and medically needy.   Participating States are required to provide Medicaid coverage to the categorically needy.[17]   The "categorically needy" are persons eligible for cash assistance under two Federal programs:   Aid to Families with Dependent Children (AFDC) and Supplemental Security Income or SSI. Participating States may elect to provide for payments of medical services to those aged blind or disabled individuals known as "medically needy" whose incomes or resources, while exceeding the

---

[16]  Section 1901 of the Social Security Act (Pub. Law 89-97).42 U.S.C. §1396.
[17]  Section 1902(a)(10) of the Act. Section 1902 of the Act is codified at 42 U.S.C.§1396a.

financial eligibility requirements for the categorically needy (such as an SSI recipient) are insufficient to pay for necessary medical care.[18]

In order to participate in the Medicaid program, a State must submit a plan for medical assistance to CMS for approval.   The State plan must specify, inter alia, the categories of individuals who will receive medical assistance under the plan and the specific kinds of medical care and services that will be covered.[19]   If the State plan is approved by CMS, under section 1903 of the Act,[20] the State is thereafter eligible to receive matching payments from the Federal government based on a specified percentage (the Federal medical assistance percentage) of the amounts expended as medical assistance under the State plan.

Within broad Federal rules, States enjoy a measure of flexibility to determine "eligible groups, types and range of services, payment levels for services, and administrative and operating procedures.[21]   Included in that flexibility are certain criteria for identifying for qualifying individuals.   The Medicaid statute sets forth a number of requirements, including income and resource limitations that apply to individuals who wish to receive medical assistance under the State plan.   Individuals who do not meet the applicable requirements are not eligible for "medical assistance" under the State plan.

While generally eligibility for Title XIX is automatic when an individual is enrolled in supplemental security income or SSI, in some States referred to as section 209B States, SSI does not confer automatic eligibility for Medicaid.   A few States make their own Medicaid eligibility decisions using the same income, resource, and disability criteria that Social Security uses for the SSI program. Alaska, Idaho, Kansas, Nebraska, Nevada, Oregon, Utah, and the Northern Mariana Islands all make their own Medicaid eligibility decisions using SSI criteria. That means that everyone who receives SSI in those jurisdictions should qualify for Medicaid. These States, however, require separate Medicaid applications. However, there are States where Medicaid enrollment is not automatic. For example, in 2014, eleven States have elected to use eligibility criteria for Medicaid that are more restrictive than SSI's. In most of those States, SSI recipients will find that the rules about income and resources or the definition of disability are more restrictive for Medicaid than they are for SSI.   The States with their own Medicaid eligibility criteria are Connecticut, Hawaii, Illinois, Minnesota, Missouri, New Hampshire, North Dakota, Ohio, Oklahoma, and Virginia. Social Security calls these ten states the

---

[18] Section 1902(a)(1)(C)(i) of the Act.
[19] *Id.* Section 1902 et seq., of the Act.
[20] Section 1903 of the Act is codified at 42 U.S.C. §1396b.
[21] *Id.*

"209(b) states" because it was section 209(b) of the Social Security Amendments of 1972 that gave states the option of using their own criteria for Medicaid.22 209(b) income limits. The exact income, resource, and disability criteria for Medicaid eligibility differs from state to state among the 209(b) States.

II.　　The Medicare Program

While Title XIX implemented medical assistance pursuant to a cooperative program with the States for certain low-income individuals, the Social Security Amendments of 1965[23] established Title XVIII of the Act, which authorized the establishment of the Medicare program to pay part of the costs of the health care services furnished to entitled beneficiaries.　The Medicare program provides medical services to aged and disabled persons and originally consisted of two Parts: Part A, which provides payment reimbursement for inpatient hospital and related post-hospital, home health, and hospice care,[24] and Part B, which is the supplemental voluntary insurance program for hospital outpatient services, physician services and other services not covered under Part A.[25]

A.　Entitlement to Part A

Section 1811 of the Social Security Act[26] explains that the insurance program, provides basic protection against the costs of hospital, related post-hospital, home health services, and hospice care in accordance with this part for individuals for whom entitlement is established by section 226 and 226A of the Social Security Act.　These are (1) individuals who are age 65 or over and are eligible for retirement benefits under title II of this Act (or would be eligible for such benefits if certain government employment were covered employment under such title) or under the railroad retirement system, (2) individuals under age 65 who have been entitled for not less than 24 months to benefits under title II of this Act (or would have been so entitled to such benefits if certain government employment were covered employment under such title) or under the railroad retirement system on the basis of a disability, and (3) certain individuals who do not meet the conditions specified in either clause (1) or (2) but who are medically determined to have end stage renal disease.

---

[22] The State of Indiana ceased being a 209b State in 2014.
[23] Pub. Law No. 89-97.
[24] Section 1811-1821 of the Act, codified at 42 U.S.C. §1395f(a)- 42 U.S.C. §1395i-5.
[25] Section 1831-1848(j) of the Act, codified at 42 U.S.C. §1395j-42 U.S.C. §1395w-4(s)
[26] Section 1811 of the Act is codified at 42 U.S.C. §1395c.

Section 226 of the Social Security Act[27] defines an individual's "entitlement" to Medicare Part A services and provides that an individual is automatically 'entitled' to benefits under Medicare Part A when the person reaches age 65 and is entitled to Social Security benefits under section 202 of the Act, or becomes disabled and has been entitled to disability benefits under section 223 of the Act for 24 calendar months.   Once a person becomes entitled to benefits under Medicare Part A, the individual does not lose such entitlement simply because there was no direct payment by the program to the hospital of a specific inpatient stay.   Entitlement to Medicare Part A reflects an individual's entitlement to Medicare Part A benefits, not the provider's entitlement or right to receive payment for services provided to such individual.[28]

B. Reasonable Costs and Payments to Provider of Services From The Federal Hospital Insurance Trust Fund

At its inception in 1965, Medicare paid for the reasonable cost of furnishing covered Part A services to beneficiaries.[29]  With respect to payments, section 1815(a) of the Act[30] provides for payments to "providers of services."   Section 1815(a) states that:

> [T]he Secretary shall periodically determine the amount which should be paid under this part to each provider of services with respect to the services furnished by it, and the provider of services shall be paid, at such time or times as the Secretary believes appropriate ….from the Federal Hospital Insurance Trust Fund, the amounts so determined, with necessary adjustments on account of previously made overpayments or underpayments; except that no such payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider under this part

---

[27] Section 226 of the Act is codified at 42 U.S.C. §426. The ESRD provisions are set forth at section 226A of the Act.
[28] Congress used the term "entitled" in the Medicaid program while used the term "eligible" in the Medicare program, which may be reflection of the different origins of the programs, as Congress has historically also referred to Medicare individuals as "beneficiaries" and Medicaid individuals as "recipients". The terms "entitled" (to give a right to) and "eligible" (qualified to participate) maybe consistent with the use of the foregoing respective terms and the programs respective histories
  See, e.g., "Judith A Moore and David G Smith, Phd, "Legislating Medicaid: Considering Medicaid and its Origins." HEALTH CARE FINANCING REVIEW/winter 2005-2006/Volume 27, Number 2.   ("Unlike Medicare, Medicaid had deep and strong roots when it was enacted. The Medical Assistance Program (Title XIX) commonly known as Medicaid had extensive legislative and programmatic heritage in the public welfare system." at 45.)
  https://www.cms.gov/Research-Statistics-Data-and-Systems/Research/HealthCareFinancingReview/downloads/05-06winpg45.pdf
[29] Under Medicare, Part A services are furnished by providers of services.
[30] Section 1815 of the Act is codified at 42 U.S.C. §1395g.

10

for the period with respect to which the amounts are being paid or any prior period.

A "provider of services" is defined at section 1861(u) of the Act[31], which states that the term means "a hospital, critical access hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency, hospice program, or, for purposes of section 1814(g) and section 1835(e), a fund." The "conditions of and limitations on payment for services" pursuant to section 1814(a)[32] specifies that "payment for services furnished an individual may be made only to providers of services which are eligible therefore under section 1866 and only if certain other conditions are met." At the beginning of the Medicare program, the statute specifically defined the term provider of services and pursuant to section 1814 states that only providers of services could be paid for Part A services provided to beneficiaries from the Federal Hospital Insurance Trust fund which is established under section 1817 of the Act.

In establishing the Trust Fund, section 1817 of the Act[33] states that: "There is hereby created on the books of the Treasury of the United States a trust fund to be known as the "Federal Hospital Insurance Trust Fund" (hereinafter in this section referred to as the "Trust Fund"). The Trust Fund shall consist of such gifts and bequests as may be made as provided in section 201(i)(1), and such amounts as may be deposited in, or appropriated to, such fund as provided in this part...." Paragraph (h) provides for "[p]ayments from Trust Fund amounts certified by Secretary" wherein "[t]he Managing Trustee shall also pay from time to/ time from the Trust Fund such amounts as the Secretary of Health and Human Services certifies are necessary to make the payments provided for by this part, and the payments with respect to administrative expenses in accordance with section 401(g)(1) of this title." The Federal Hospital Insurance Trust Fund is sometimes referred to as the Part A Trust Fund or the HI Fund.

C. Section 1876 of the Act and the Authorization of Payment to Health Maintenance Organizations

The Social Security Amendments of 1972, as further amended in 1982,[34] added section 1876[35] to the Act to authorize Medicare payments to health maintenance organizations

---

[31] Section 1861(u) of the Act is codified at 42 U.S.C. §1395x(u).
[32] Section 1814(a) of the Act is codified at 42 U.S.C. §1395f(a).
[33] 42 U.S.C. §1395i.
[34] In an effort to improve Medicare payment methods for HMOs, Congress enacted section 114 of the Tax Equity & Fiscal Responsibility Act (TEFRA) of 1982, to provide for the inclusion of competitive medical plans. Pub. Law No. 97-248.
[35] Section 1876 of the Act is codified at 42 U.S.C. §1395nn.

(HMOs) (also referred to as managed care organizations) on a capitation basis.[36] Section 1876(d) explained with respect to the beneficiaries that could access this method of receiving Part A benefits that:

> (d) Subject to the provisions of subsection (c)(3), every individual entitled to benefits under part A and enrolled under part B or enrolled under part B only (other than an individual medically determined to have end-stage renal disease) shall be eligible to enroll under this section with any eligible organization with which the Secretary has entered into a contract under this section and which serves the geographic area in which the individual resides.

As noted above, under Part A generally payment originally could only be made to "providers of services." Section 1876(i)(7)(B)[37] was added to state that:"[f]or purposes of payment under this title, the cost of such agreement to the eligible organization shall be considered a cost incurred by a provider of services in providing covered services under this title..." In addition, section 1811 was amended regarding the conditions of and limitations on payment for services only to providers of services to state that this limitation excepted payments under section 1876. Thus, these provisions made it possible for the Part A fund payments to be made under section 1876 of the Act.

---

[36] Pub. Law No. 92-603. Cost-based managed care organizations (MCOs) may elect to directly process and pay for some services. Specifically, MCOs may handle payment for services rendered by hospitals. CMS requires that each MCO decide if CMS will process and pay for the services provided (Option 1) or if the MCO will process and pay for the services provided (Option 2).4 If the MCO elects to have CMS process and pay for the claim, the claim will be found in the Medicare fee-for-service utilization files. If the MCO elects Option 2, then the MCO will maintain the claim in a stand-alone system. Even though the Medicare utilization files contain predominately fee-for-service claims, CMS did require MCOs (both risk-based and cost-based) to submit certain types of claims to Medicare Administrative Contractor (MAC), formerly known as Fiscal Intermediaries or Carriers, for processing.

[37] Section 1876(i)(7)(B) provides that: "For purposes of payment under this title, the cost of such agreement to the eligible organization shall be considered a cost incurred by a provider of services in providing covered services under this title and shall be paid directly by the Secretary to the review organization on behalf of such eligible organization in accordance with a schedule established by the Secretary. (C) Such payments— (i) shall be transferred in appropriate proportions from the Federal Hospital Insurance Trust Fund and from the Supplementary Medical Insurance Trust Fund, without regard to amounts appropriated in advance in appropriation Acts, in the same manner as transfers are made for payment for services provided directly to beneficiaries, and (ii) shall not be less in the aggregate for such organizations for a fiscal year than the amounts the Secretary determines to be sufficient to cover the costs of such organizations' conducting activities described in subparagraph (A) with respect to such eligible organizations under part B of title XI."

D. The Inpatient Prospective Payment System

Concerned with increasing Medicare costs, Congress also enacted Title VI of the Social Security Amendments of 1983.[38] This provision added section 1886(d) of the Act[39] and established the inpatient prospective payment system (IPPS) for reimbursement of Part A inpatient hospital operating costs for all items and services provided to Medicare beneficiaries, other than physician's services, associated with each discharge.   The purpose of IPPS was to reform the financial incentives hospitals face, promoting efficiency by rewarding cost effective hospital practices.[40]

These amendments changed the method of payment for inpatient hospital services for most hospitals under Medicare. Under IPPS, hospitals and other health care providers are reimbursed their inpatient operating costs on the basis of prospectively determined national and regional rates for each discharge rather than reasonable operating costs. Thus, hospitals are paid based on a predetermined amount depending on the patient's diagnosis at the time of discharge. Hospitals are paid a fixed amount for each patient based on diagnosis related groups (DRG) subject to certain payment adjustments.

The IPPS provides for several add-on payments or adjustments to the DRG payment which includes for additional payments relating to direct graduate medical education (DGME) and indirect medical education (IME) adjustment and an adjustment payment made for hospitals that serve a disproportionate share of low income patients referred to as the DSH payment. Originally, IME and GME payments to teaching hospitals were made only related to traditional Medicare fee-for-service (FFS). Sections 4622 and 4624 of the Balanced Budget Act (BBA) of 1997, began providing hospitals with additional payments for IME and DGME costs for patients enrolled in a Medicare managed care program.

1.   The Medicare Disproportionate Share Hospital Adjustment

Because of the possible payment inequities for IPPS hospitals that treat a disproportionate share of low-income patients, Congress directed the Secretary to provide, for discharges occurring after May 1, 1986, "for hospitals serving a significantly disproportionate number of low-income patients"[41] referred to as the disproportionate share hospital adjustment or DSH adjustment. There are two methods to determine eligibility for a

---

[38]  Pub. Law No. 98-21.
[39]  Section 1886(d) of the Act is codified at 42 U.S.C. §1395ww(d).
[40]  H.R. Rep. No. 25, 98th Cong., 1st Sess. 132 (1983).
[41]  Section 9105 of the Consolidated Omnibus Budget Reconciliation Act of 1985 (Pub. L. No. 99-272). *See also* 51 Fed. Reg. 16,772, 16,773-16,776 (1986).

13

Medicare DSH adjustment: the "proxy method" and the "Pickle method."[42]   To be eligible for the DSH payment, an IPPS hospital must meet certain criteria concerning, inter alia, its disproportionate patient percentage or DPP.   Relevant to this case, section 1886(d)(5)(F)(vi) of the Act states that the terms "disproportionate patient percentage" means the sum of two fractions which is expressed as a percentage for a hospital's cost reporting period.   The fractions are often referred to as the "Medicare low-income proxy" (or Medicare/SSI fraction) and the "Medicaid low-income proxy" (or Medicaid fraction). The Medicare/SSI fraction is defined at section 1886(d)(5)(F)(vi)(I) of the Act (Clause I) as:

> (I)   the fraction (expressed as a percentage) the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under Part A of this title and were entitled to supplemental security income benefits (excluding any State supplementation) under title XVI of this Act and the denominator of which is the number of such hospital's patients day for such fiscal year which were made up of patients who (for such days) were entitled to benefits under Part A of this title.

The Medicaid fraction is defined at section 1886(d)(5)(F)(vi)(II) of the Act (Clause II) as:

> (II) the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patients days for such period which consists of patients who (for such days) were eligible for medical assistance under a State Plan approved under title XIX, but who were not entitled to benefits under Part A of this title, and the denominator of which is the total number of the hospital patients days for such period.

The regulations located at 42 C.F.R. §412.106[43] govern the Medicare DSH payment adjustment and specifically describes the method by which the DPP is calculated as well as the method of counting beds and patient days in determining the Medicare DSH payment adjustment. Because the DSH payment adjustment is part of the hospital inpatient payment, the statutory references under section 1886(d)(5)(F) of the Act to "days" apply only to hospital acute care inpatient days. Under § 412.106(a)(1)(i), the number of beds for the Medicare DSH payment adjustment is determined in accordance with bed counting rules for

---

[42]   The Pickle method is set forth at section 1886(d)(F)(i)(II) of the Act.
[43]   The language referenced in the regulation for the cost period at issue is without the text added pursuant to the FFY 2007 technical correction.

14

the IME adjustment under 42 C.F.R. §412.105(b). The regulation at 42 C.F.R. §412.106 states:

> (a) General considerations. (1) The factors considered in determining whether a hospital qualifies for a payment adjustment include the number of beds, the number of patient days, and the hospital's location.
> (i) The number of beds in a hospital is determined in accordance with §412.105(b).
> (ii) For purposes of this section, the number of patient days in a hospital includes only those days attributable to units or wards of the hospital providing acute care services generally payable under the prospective payment system and excludes patient days associated with— (A) Beds in excluded distinct part hospital units; (B) Beds otherwise countable under this section used for outpatient observation services, skilled nursing swing-bed services, or ancillary labor/delivery services. This exclusion would not apply if a patient treated in an observation bed is ultimately admitted for acute inpatient care, in which case the beds and days would be included in those counts; (C) Beds in a unit or ward that is not occupied to provide a level of care that would be payable under the acute care hospital inpatient prospective payment system at any time during the 3 preceding months (the beds in the unit or ward are to be excluded from the determination of available bed days during the current month); and (D) Beds in a unit or ward that is otherwise occupied (to provide a level of care that would be payable under the acute care hospital inpatient prospective payment system) that could not be made available for inpatient occupancy within 24 hours for 30 consecutive days.

The first computation, the Medicare/SSI fraction set forth at 42 C.F.R. §412.106(b)(2) stated:

> (2) First computation: Federal fiscal year. For each month of the Federal fiscal year in which the hospital's cost reporting period begins, [CMS]—
> (i) Determines the number of covered patient days that—
> (A) Are associated with discharges occurring during each month; and
> (B) Are furnished to patients who during that month were entitled to both Medicare Part A and SSI, excluding those patients who received only State supplementations:
> (ii) Adds the results for the whole period; and

(iii) Divides the number determined under paragraph (b)(2)(ii) of this section by the total number of patient days that—
(A) Are associated with discharges that occur during that period: and
(B) Are furnished to patients entitled to Medicare Part A.

The second computation, referred to as the Medicaid fraction, is set forth at 42 C.F.R. §412.106(b)(4) and provided that:

Second computation. The fiscal intermediary determines, for the hospital's cost reporting period, the number of patient days furnished to patients entitled to Medicaid but not to Medicare Part A, and divides that number by the total number of patient days in the same period.

CMS issued several program memorandums explaining the days to be counted in the numerator of the Medicaid fraction   For example, PM A-99-62 (Change Request 1052, dated December 1999) extensively discussed allowable Medicaid days. This memorandum was followed by PM A-01-131 (Change request 1052) which again discussed the "Clarification of Allowable Medicaid Days in the Medicare Disproportionate Share Hospital (DSH) Adjustment Calculation." Various other Federal Register publications discussed the days to be included in the Medicaid fraction prior to the discussion set forth in the "2004" rule, none of which discussed a policy of including the Part C days in the numerator of the Medicaid fraction.

2.  Source of the documentation for the DSH fraction

For the purposes of the Medicare fraction, the agency found it appropriate to use the Medicare Provider Analysis and Review (MedPAR) data as the source for the Medicare DSH calculation. Principally, as documented in the Federal Register, the MedPAR system has been the Medicare Part A data source for the Medicare DSH calculation since the implementation of the DSH adjustment. The MedPAR files contains information for all Medicare beneficiaries using hospital inpatient services. Data is provided by state and then by DRG for all short stay and inpatient hospitals based upon filed claims. The accumulation of claims from a beneficiary's date of admission to an inpatient hospital, where the beneficiary has been discharged, or to a skilled nursing facility, where the beneficiary may still be a patient, represents one stay. A stay record may represent one claim or multiple claims. MedPAR records represent final action claims data in which all adjustments have been resolved. Since the SSI/Medicare percentages are determined by CMS on a fiscal year basis, hospitals have the option (for settlement purposes) of determining their SSI/Medicare percentage based upon data matching their own cost

16

reporting period.   If a hospital avails itself of this option, it must furnish its MAC, in a manner and format prescribed by CMS, data on its Medicare patients for the cost reporting period.   CMS will match these data to the data supplied by SSA to determine the patients dually entitled to Medicare Part A and SSI for the hospital's cost reporting period.

With respect to the Medicaid fraction, hospitals are responsible for proving Medicaid eligibility for each Medicaid patient day and verifying with the State that the patients were eligible for Medicaid on the claimed days for purposes of the numerator of the Medicaid fraction. However, in accordance with 42 C.F.R. §412.106(b)(4), a day does not count in the numerator of the Medicaid disproportionate share adjustment calculation if the patient was entitled to both Medicare Part A and Medicaid on that day.   Therefore, once the eligibility of the patient for Medicaid under a State plan approved under Title XIX has been verified, the MAC must determine whether any of the days are dual entitlement days and, to the extent that they are, subtract the days from the other days in the calculation. The hospital bears the burden of proof and must verify with the State that the patient was eligible under one of the allowable categories during each day of the patient's stay.   The hospital is responsible for and must provide adequate documentation to substantiate the number of Medicaid days claimed.   Days for patients that cannot be verified by State records to have fallen within a period wherein the patient was eligible for Medicaid as described in this memorandum cannot be counted.

Regarding the denominator of the Medicaid fraction, the number of Medicaid/ non-Medicare days is "divided by the hospital's total number of inpatient days in the same period. Total inpatient days (all payors) are reported on the Medicare cost report. This number is also available in the hospital's own records."[44] In particular, the inpatient days are reported on Worksheet S-3 of the cost report. The Worksheet S-3 Part I "Hospital and Hospital Health Care Complex Statistical Data" collects statistical data regarding beds, days, FTEs, and discharges from, among other things, the hospital's records.[45] The inpatient day must meet the definition of an inpatient day set forth at 42 C.F.R. §412.106

E. Medicare Part C

The Balanced Budget Act of 1997 (BBA) removed the risk-based option under section

---

[44] *See, e.g.*, 70 Fed. Reg. 47298, 47441 (Aug 12 2005).
[45] The Secretary stated: "Some commenters asked that CMS further clarify the methodology for determining total patient days in the denominator of the Medicaid proxy for the Medicare DSH calculation. Response: Our proposal made no changes to the way in which CMS requires hospitals to accumulate total patient days for the denominator of the Medicaid fraction of the DPP for the Medicare DSH calculation. 74 Fed. Reg. 43754, 43899 (August 27, 2009).

17

1876 and replaced it with the Medicare+Choice program (later expanded and called the Medicare Advantage Program). The BBA also included provisions for phasing out the section 1876 cost-based HMO/CMPs. Section 4001 of the Balanced Budget Act (BBA) of 1997, established the Medicare + Choice program (M+C)[46] by adding a new Part C to Title XVIII of the Act pursuant to sections 1851 through 1859.[47] The introduction of private plans with coordinated care and more comprehensive benefits that provided under traditional Medicare were for the dual aims of giving beneficiaries a choice of health insurance plans beyond the fee-for-service Medicare program and transferring to the Medicare program the efficiencies and cost savings achieved by managed care in the private sector. The Secretary explained that:

> As its name implies, the primary goal of the M+C program is to provide Medicare beneficiaries with a wider range of health plan choices through which to obtain their Medicare benefits. The M+C statute authorizes a variety of private health plan options for beneficiaries, including both the traditional managed care plans (such as those offered by HMOs) that traditionally have been offered under section 1876 of the Act, and new options that were not previously authorized. Specifically, section 1851(a)(2) of the Act describes three types of M+C plans authorized under Part C....

Other additional changes to the Program included:

> In addition to expanding the types of health plans that can be offered to Medicare beneficiaries, the M+C program introduces several other fundamental changes to the managed care component of the Medicare program. These changes include:
> - Establishment of an expanded array of quality assurance standards and other consumer protection requirements;
> - Introduction of an annual coordinated enrollment period, in conjunction with the distribution by us of uniform, comprehensive information about

---

[46] Sections 1851 through 1859 is codified respectively at 42 U.S.C. §1395w-21, §1395w-22, §1395w-23, §1395w-24, §1395w-25, §1395w-26, §1395w-27, §1395w-27a, §1395w-28.   The program is now referred to as the Medicare Advantage (MA) program but the terms are used interchangeably.   The MA program replaced the M+C program, while retaining most key features of the M+C program.   The MA program was enacted in Title II of The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) (Pub. L. 108–173) on December 8, 2003.   *See* 69 Fed. Reg. 46,866 (Aug. 3, 2004) and 70 Fed. Reg. 4,194 (Jan. 28, 2005).

[47] The existing Part C of the statute, which included provisions in section 1876 of the Act governing existing Medicare HMO contracts, was redesignated as Part D.   See 63 Fed. Reg. 34,968 (June 26, 1998).   Section 101 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) (Pub. L. 108–173) amended Title XVIII of the Act by establishing a new Part D: the Voluntary Prescription Drug Benefit Program.   See 70 Fed. Reg. 4,194 (Jan. 28, 2005).

18

M+C plans that is needed to promote informed choices by beneficiaries;
- Revisions in the way we calculate payment rates to M+C organizations that
will narrow the range of payment variation across the country and increase
incentives for organizations to offer M+C plans in diverse geographic
areas...[48]

1. Enrollment in Medicare Part C

As enacted by section 4001 of the BBA of 1997, section 1851 of the Act, provides that in
order to be eligible to enroll in an M+C plan, an individual must be "entitled to benefits
under Medicare Part A".   Section 1851 of the Act states in pertinent part that:

(a) Choice of Medicare Benefits through Medicare+Choice plans.—

(1)  In  General.—Subject  to  the  provisions  of  this  section,  each
Medicare+Choice eligible individual (as defined in paragraph (3)) is entitled
to elect to receive benefits (other than qualified prescription drug benefits)
under this title—

(A) through the original Medicare fee–for–service program under parts A
and B, or

(B) through enrollment in a Medicare+Choice plan under this part, and may
elect  qualified  prescription  drug  coverage  in  accordance  with  section
1860D-1.

****

(3) Medicare+Choice eligible individual.—

(A) In general.—In this title, subject to subparagraph (B), the term
Medicare+Choice eligible individual means an individual who is entitled to
benefits under part A and enrolled under part B.

2. Benefits Under Part C

---

48   65 Fed Reg. 40170 (June 29, 2000) (Medicare Program; Medicare+Choice Program).

Section 1852(a) of the Act provides that regarding the basic benefits offered under Part C that:

(1) Requirement.—

(A) In general.—Except as provided in section 1859(b)(3) for MSA plans and except as provided in paragraph (6) for MA regional plans, each Medicare+Choice plan shall provide to members enrolled under this part, through providers and other persons that meet the applicable requirements of this title and part A of title XI, benefits under the original medicare fee-for-service program option (and, for plan years before 2006, additional benefits required under section 1854(f)(1)(A))

(B) Benefits under the original medicare fee-for-service program option defined.—

(i) In general.—For purposes of this part, the term "benefits under the original medicare fee-for-service program option" means those items and services (other than hospice care) for which benefits are available under parts A and B to individuals entitled to benefits under part A and enrolled under part B, with cost-sharing for those services as required under parts A and B or, subject to clause (iii),an actuarially equivalent level cost-sharing as determined in this part.....

In addition, consistent with the statute at section 1851, et seq., the regulation at 42 C.F.R. §422.2 defines a Medicare Advantage (MA) plan to mean "health benefits coverage offered under a policy or contract by an MA organization that includes a specific set of health benefits offered at a uniform premium and uniform level of cost-sharing to all Medicare beneficiaries residing in the service area of the MA plan. . . ." Generally, each MA plan must at least provide coverage of all services that are covered by Medicare Part A and Part B, but also may provide for Medicare Part D benefits and/or additional supplemental benefits. However, certain items and services, such as hospice benefits, continue to be covered under Medicare fee-for-service (FFS). Under 42 C.F.R. §422.50 of the regulations, an individual is eligible to elect an MA plan if he or she is entitled to Medicare Part A and enrolled in Medicare Part B. Dual eligible beneficiaries (individuals entitled to Medicare and eligible for Medicaid) also may choose to enroll in a MA plan, and, as an additional supplemental benefit, the MA plan may pay for Medicare cost-sharing not covered by Medicaid.

3. How Part C is paid

Notably, with respect to payment, section 1851 of the Social Security Act provides that:

(i) Effect of Election of Medicare+Choice Plan Option.—
(1) Payments to organizations.—Subject to sections 1852(a)(5), 1853(a)(4), 1853(g), 1853(h), 1886(d)(11), and 1886(h)(3)(D), payments under a contract with a Medicare+Choice organization under section 1853(a) with respect to an individual electing a Medicare+Choice plan offered by the organization shall be instead of the amounts which (in the absence of the contract) would otherwise be payable under parts A and B for items and services furnished to the individual.
(2) Only organization entitled to payment.—Subject to sections 1853(a)(4), 1853(e), 1853(g), 1853(h), 1857(f)(2), 1858(h), 1886(d)(11), and 1886(h)(3)(D), only the Medicare+Choice organization shall be entitled to receive payments from the Secretary under this title for services furnished to the individual.

Section 1853 of the Social Security Act provides that:

(f) Payments from Trust Funds.—The payment to a Medicare+Choice organization under this section for individuals enrolled under this part with the organization and for payments under subsection (l) and subsection (l) and payments to a Medicare+Choice MSA under subsection (e)(1) shall be made from the Federal Hospital Insurance Trust Fund and the Federal Supplementary Medical Insurance Trust Fund in such proportion as the Secretary determines reflects the relative weight that benefits under part A and under part B represents of the actuarial value of the total benefits under this title. Payments to MA organizations for statutory drug benefits provided under this title are made from the Medicare Prescription Drug Account in the Federal Supplementary Medical Insurance Trust Fund. Monthly payments otherwise payable under this section for October 2000 shall be paid on the first business day of such month. Monthly payments otherwise payable under this section for October 2001 shall be paid on the last business day of September 2001. Monthly payments otherwise payable under this section for October 2006 shall be paid on the first business day of October 2006.

Thus, the statute authorizes the Secretary to make payments from the Federal Hospital Insurance Trust Fund to qualified Part C organizations for the Part A services and benefits provided to the Medicare beneficiary.[49]

---

[49] Because CMS calculated payment based on covered services provided during the previous year, CMS does evaluate the impact of National Coverage Determinations (NCDs) on MCO payment. National Coverage


managed care organizations [53]   While CMS initially required the submission of comprehensive data regarding services provided by managed care organizations and other entities, including comprehensive inpatient hospital encounter data, starting in 2001 CMS subsequently permitted Part C organizations and other entities to submit an "abbreviated" set of data. CMS collected limited risk adjustment under OMB No. 0938-0878 in an apparent and conscious attempt to reduce the paperwork burden in the health care industry.[54]   During this time, CMS also transitioned to collecting a larger set of medical data to new data system via the Risk Adjustment Processing System (RAPS)—to risk adjust payments.

As required by law, the agency began using information on enrollee demographics and diagnoses collected from plans for services provided in physician office, hospital inpatient, and hospital outpatient settings to risk adjust payments in 2004.[55]  When CMS transitioned to RAPS in 2002, the agency relaxed this requirement and allowed plans to submit data with fewer data elements via RAPS. CMS' 2008 final rule represents a return to the collection of more detailed encounter data.[56]   The Secretary explained the progression of the collection of encounter data for managed care and related organizations for purposes of the development of the risk methodology with a focus on the administrative burdens, stating

> [BIPA] 2000, enacted in December 2000, stipulates that the risk adjustment methodology for 2004 and succeeding years should be based on data from inpatient hospital and ambulatory settings. …. The Secretary suspended the submission of physician and hospital outpatient encounter data in May 2001 and directed us to develop a risk adjustment approach that balanced payment accuracy with data burden. We worked with M+C organizations, their associations, and other interested parties to develop a risk adjustment

---

[53] CMS has the authority to require: Cost HMOs/CMPs to submit encounter data under 42 C.F.R. §417.568(b)(1) and 42 C.F.R. §427.576(b)(2)(iii); HCPPs to submit encounter data under 42 C.F.R. §417.806(c) and 42 C.F.R. §417.871(b)(2)(iii).

[54] Department of Health and Human Services OMB Control Number: 0938-0878 "Title: Collection of Diagnostic Data from Medicare Advantage Organizations for Risk Adjusted Payments Supporting Reg 42 CFR Part 422 & 423 Subparts F and G     Purpose of the Collection: This collection implements health status risk adjustment payment methodology for Parts C and D that takes into account the health status of plan enrollees. CMS collects inpatient and outpatient data. CMS will use the data to make risk adjusted payment under Parts C and D, MA plans and Medicare Advantage Prescription Drug plans.   How Reduction Achieved: CMS reduced the burden by streamlining the systems used to collect risk adjustment data and requiring a substantially reduced data set. Change in Burden: -10,526 hours."

[55] Using these data in conjunction with FFS beneficiaries' cost and diagnosis information, CMS developed the hierarchical condition categories risk adjustment model that uses one year's diagnoses to predict the following year's health care costs for each Part C enrollee.

[56] See 73 Fed. Reg. 48434 (Aug. 19, 2008).

approach that significantly reduced the burden of data collection for M+C organizations compared to the approach that was suspended in May of 2001. The result of this effort was to reduce burden by approximately 98 percent. The reduction in burden was accomplished by decreasing the number of data elements submitted... and creating a simplified data submission format and processing system... The Risk Adjustment Processing System (RAPS) became operational on October 1, 2002.[57]

Thus, subsequent to the enactment of Part C, which required the development of a risk based methodology from data required to be submitted by managed care plans (not providers), CMS developed new procedures and systems for collecting data for Part A services provide pursuant to managed care organizations that were separate from the prior established data systems originally developed under Part A.

II. Interpretation of the phrase "entitled to Medicare Part A" under section 1886(d)(5)(F) of the Act.

This case was remanded to the Secretary for proceedings consistent with the Court's opinion in *Allina Health Services v. Sebelius*, 746 F.3d. 1102 (D.C. Cir. 2014).   The Court held that Secretary did not provide adequate notice and opportunity to comment before promulgating the FFY 2005 IPPS Rule[58] (referred to as the 2004 Rule) that announced the Secretary's interpretation of the Medicare Disproportionate Share Hospital Fraction as codified in 2007 at 42 CFR 412.106(b)(2) .   The Court affirmed that portion of the district court's opinion vacating the rule.   However, the Court of Appeals reversed the portion of the district opinion directing the Secretary to recalculate the hospital(s) reimbursement using the alternative method of including the subject Part C days in the Medicaid fraction. That is, the district court required the Secretary to affirmatively count

---

[57]  67 Fed. Reg. 79122, 79123 (Medicare Program: National Medicare+Choice Risk Adjustment Public Meeting—February 3, 2003) (December 27, 2002).   See also 70 Fed. Reg.4588, 4657 (January 28, 2005)("Comment: One commenter suggested that CMS be less concerned about the burden on MA organizations of submitting risk adjustment data and more concerned about the accuracy of these data.... Response: In 2000, we implemented a risk adjustment model based on only principal inpatient hospital diagnosis data. The industry voiced concerns that the inpatient hospital model draws on diagnoses from an acute care setting only, and therefore, is less accurate. In 2004, we implemented a more comprehensive model with a more complete list of acute and chronic diagnoses. Diagnosis data are now being collected from three settings: inpatient hospital, outpatient hospital and physician office settings. At the same time as the more accurate, comprehensive model was being implemented, we began requiring an abbreviated set of data elements to be reported in order to reduce any unnecessary administrative burden on the MA organizations. ...[T]he fact that we no longer collect a full set of encounters for each MA enrollee means only that we do not have accurate utilization data for future recalibration of risk adjustment models....")
[58]  69 Fed. Reg. 48916, 49099 (August 11, 2004).

Part C days under the Medicaid fraction for 2007.   The Court restated that, as it had previously found, the phrase "entitled to benefits under part A" is ambiguous.[59]   The Court of Appeals in reversing that part of the district court order, explained that the question of whether the Secretary might achieve the same result through adjudication was not before the district court and, therefore, the court erred by directing the Secretary how to calculate the hospital's reimbursements, rather than just remanding after identifying the error.    The Court cited to *SEC v. Chenery Corp.*, 332 U.S. 194. 201 (1947), which observed in that case that "[a]fter remand was made therefore the Commission was bound to deal with the problem afresh, performing the function delegated to it by Congress." Consequently, the case is before the Administrator for a determination as to the appropriate treatment of the MA days with respect to the calculation of the Disproportionate Share Hospital payment adjustment for the specific Providers and cost year at issue in this case.

As further explained below, the Administrator finds that the Part C days at issue in this case are to be counted in the Medicare fraction and should not be counted in the Medicaid fraction. The Administrator finds that, based on section 1886(d)(5)(F)(I) of the Act, Part C enrollee patient days should be included in calculating the DSH adjustment as such enrollees are entitled to benefits under Part A. In other words, the Part C patients are entitled to Medicare Part A prior to and after selecting Part C, and because they do not lose that entitlement when they choose to enroll in a Part C plan, the Medicare Part C days should be included in the numerator and denominator of the Medicare fraction, regardless of whether the beneficiary elects for Part C coverage.   The Administrator further finds that, with regard to the Medicaid fraction, as stated in section 1886(d)(5)(F)(II) of the Act, the number of patient days for patients who, for those days, were eligible for medical assistance under a State plan approved under Title XIX (Medicaid), but who were not entitled to benefits under Medicare Part A is divided by the total number of patient days for that same period. As the Administrator finds that the Part C enrollees are entitled to benefits under Medicare Part A, therefore, these patient days should not be included in the Medicaid portion of the calculation.

A. Preliminary Issues

On remand, the Court of Appeals stated that the agency must deal with the issue "afresh." The Providers advanced the argument that there is no "clean slate" as the days must be placed in the Medicaid fraction because, *inter alia,* the agency has not subjected any other interpretation to timely notice and comment rulemaking for the year in this case and that flaw cannot be cured on remand. However, the Supreme Court in past cases has recognized an agency's authority to conduct rulemaking through adjudication on a case by

---

[59] *Northeast Hospital Corporation v. Sebelius*, 657 F. 3d. 1, 13 (D.C. Cir. 2011).

case basis. *Shalala v. Guernsey Memorial Hosp.,* 514 U.S. 87 (1995). The APA does not require that all the specific applications of a rule evolve by further, more precise rules rather than by adjudication. *See NLRB v. Bell Aerospace Co.,* 416 U.S. 267 (1974); *SEC v. Chenery Corp.,* 332 U.S. 194 (1947). ("The Secretary's mode of determining benefits by both rulemaking and adjudication is, in our view, a proper exercise of her statutory mandate.") The case is properly before the Administrator to determine the issue consistent with the Court's order.

The Providers maintained that CMS cannot exclude the days from the Medicaid fraction for their DSH payment, because they state that CMS' pre-2004 regulation and longstanding policy prior to the 2004 final rule was to exclude Part C days in the Medicare fraction. The Providers alleged that CMS included those days in the Medicaid fraction and therefore can only change this pre-existing 2004 rule through notice and comment rulemaking. The Providers argued that the pre-2004 rule included only covered days in the Medicare fraction and therefore by definition excluded Part C days.

However, the Administrator finds that the "covered days" requirement was not an interpretation of the statutory phrase "entitled to benefits under Part A", but rather was an interpretation, regarding the parenthetical phrase "for such days" (which modified the phrase "entitled to benefits under Part A") and that therefore Congress was referring to covered days in the Medicare fraction. Under CMS' policy, the Medicare fraction would include covered inpatient days regardless of whether the Part A benefit for the inpatient day was provided under traditional Medicare fee-for-service or through Medicare managed care programs. Therefore, no interpretation of the pre-2004 regulation would prohibit the counting of Part C days in the Medicare fraction. Further, the Court specified in *Northeast,* 657 F. 3d at 14, that: "Prior to 2004, the regulation did not specify where M+C enrollees should be counted."

Further, while the Providers claimed that the days were, as a matter of practice, included in the Medicaid fraction, the Administrator points out that the Part C days were included in the denominator of the Medicaid fraction as they met the definition of an inpatient day and, therefore, were included as the "total number of inpatient days". As noted, this statistic is derived from the Medicare cost report, Worksheet S-3, "Hospital and Hospital Care Complex Statistical Data and Hospital Wage Index Information". This data is obtained from, *inter alia,* the hospital records when the hospital completes the cost report statistical data Worksheet S-3. The inclusion of Part C days in the denominator of the Medicaid fraction only means that these days were being captured as, and met the definition of, "inpatient" days which is not dispositive of the matter here, nor does it demonstrate that

26

these days were treated by CMS as days for patients eligible for Medicaid and not entitled to Medicare Part A.

However, the Providers also maintained that the Court found that CMS had a long practice of including the Part C days in "the Medicaid fraction *(if Medicaid eligible)*." In addressing the government's contention that the Secretary did not previously actually include Part C days in the Medicaid fraction, the Court responded that: "this argument disregards our holding in *Northeast Hospital*, where we explicitly stated that the Secretary did have a prior practice of excluding part C days from the Medicare fraction, 657 F 3d at 17. Granted, we did not say the Secretary counted the Part C days in the Medicaid fraction, but the statute unambiguously required that PartC days be counted in one fraction or the other."   The Court also stated that: "The Secretary's interpretation as set forth in the 2004 rulemaking and resulting amendment to 412.106 contradicts her former practice of excluding M+C days from the Medicare fraction."   Thus, Administrator respectfully notes that the Court did not find that the Secretary affirmatively included the days in the numerator of the Medicaid fraction ("if Medicaid eligible"), but rather that the agency had a practice of excluding the days from the Medicare fraction and that the days were required to be included in one fraction, or the other, for the DSH patient percentage.   The Court did not hold that the Secretary had adopted a legal interpretation of the phrase "entitled to benefits under Part A" or an authoritative agency Medicare payment policy on that phrase with respect to Part C days.

Regarding prior policy, while, the Administrator recognizes that the Court found the link between the section 1876 and Part C programs indirect, yet would respectfully point out that, when Part C was enacted, it expanded and superseded (except for cost-based section 1876 contracts which were to be phased out) the risk-based managed care organizations provided for under section 1876 of the Act. In describing the individuals that could access this method of receiving Part A benefits, section 1876(d) states that "every individual entitled to benefits under part A and enrolled under part B …. shall be eligible to enroll under this section with any eligible organization with which the Secretary has entered into a contract under this section and which serves the geographic area in which the individual resides. Similarly, Congress in enacting the superseding Part C program provided that the term "Medicare+Choice eligible individual means an individual who is entitled to benefits under part A and enrolled under part B". Consequently, Congress used identical language in describing the same class of individuals that could enroll in the section 1876 managed care organizations and the individuals that could enroll in the Part C managed care organizations.

In addition, the relationship of the earlier managed care provision, established at section 1876, and the later Medicare Part C plans, established at section 1851, et seq., is also reflected in the automatic enrollment of beneficiaries from one program to the other program.   Further, the determination of the initial payment rate can be based, in part, on the section 1876 rates as established in sections 1853(a)(1)(A)[60] and 1853(c)[61] of the Act. In addition, section 1851(h)(4) of the Act provides that M+C organizations shall conform to "fair marketing standards" and requires that the fair marketing standards prohibit organizations from providing cash or other monetary inducements for enrollment. For that purpose, section 1851(h)(4) of the Act includes the existing section 1876 standards as provided for in section 1856(b)(2) of the Act.   Further, similar to the authorization of the payment structure for the section 1876 managed care organizations, the provision, inter alia, of section 1853 confirms that the payments to the Part C organizations are similarly made proportionally from the Federal Hospital Insurance Trust Fund, established to fund Part A services under section 1817, and from the Federal Supplemental Medical Insurance Trust Fund established to pay for Part B services. Based on these factors, CMS has reasonably referred to the treatment of the section 1876 days in evaluating the treatment of Part C days based on the identical language describing the eligible beneficiaries for the

---

[60]Section 1853 states that: "(a)   Payments to Organizations.— (1) Monthly payments.—(A) In general.—Under a contract under section 1857 and subject to subsections (e), (g), (i), and (l) and section 1859(e)(4), the Secretary shall make monthly payments under this section in advance to each Medicare+Choice organization, with respect to coverage of an individual under this part in a Medicare+Choice payment area for a month, in an amount determined as follows:....(i) Payment before 2006.—For years before 2006, the payment amount shall be equal to 1/12 of the annual MA capitation rate (as calculated under subsection (c)(1)) with respect to that individual for that area, adjusted under subparagraph (C) and reduced by the amount of any reduction elected under section 1854(f)(1)(E) ...."

[61] Section 1853(c) of the Act states that: "Calculation of Annual Medicare+Choice Capitation Rates.—(1) In general.—For purposes of this part, subject to paragraphs (6)(C) and (7), each annual Medicare+Choice capitation rate, for a Medicare+Choice payment area that is an MA local area for a contract year consisting of a calendar year, is equal to the largest of the amounts specified in the following subparagraph (A), (B), (C), or (D):   .... (B) Minimum amount.—12 multiplied by the following amount: (i) For 1998, $367 (but not to exceed, in the case of an area outside the 50 States and the District of Columbia, 150 percent of the annual per capita rate of payment for 1997 determined under section 1876(a)(1)(C) for the area)....   .... (C) Minimum percentage increase.—  (i) For 1998, 102 percent of the annual per capita rate of payment for 1997 determined under section 1876(a)(1)(C) for the Medicare+Choice payment area. ....    (D) 100 percent of fee-for-service costs.— (i) In general.—For each year specified in clause (ii), the adjusted average per capita cost for the year involved, determined under section 1876(a)(4) and adjusted as appropriate for the purpose of risk adjustment. ...   (3) Annual area–specific Medicare+Choice capitation rate.— (A) In general.—For purposes of paragraph (1)(A), subject to subparagraphs (B) and (E), the annual area-specific Medicare+Choice capitation rate for a Medicare+Choice payment area— (i) for 1998 is, subject to subparagraph (D), the annual per capita rate of payment for 1997 determined under section 1876(a)(1)(C) for the area, increased by the national per capita Medicare+Choice growth percentage for 1998 (described in paragraph (6)(A)); or...."

respective provision, and the related provisions showing the origin of certain provisions and rates of Part C from the section 1876 program for Part A services.[62]

CMS had determined that it was appropriate to include the days associated with Medicare patients who receive care at a qualified managed care organization, also referred to as a health maintenance organization (HMO) in the Medicare fraction based on the language of section 1886(d)(5)(F)(vi) of the Act and based on such patients understood original and continued "entitlement to Part. A." The Secretary responded to commenters concerns regarding the treatment of Medicare HMO days in the calculation of the DSH patient percentage. In the September 4, 1990 IPPS final rule, the Secretary stated that:

> Comment: One commenter believes that the disproportionate share adjustment calculation should be expanded to include days that Medicare patients utilize health maintenance organizations (HMOs) since these beneficiaries are entitled to Part A benefits. Response: Based on the language of section 1886(d)(5)(F)(vi) of the Act, which states that the disproportionate share adjustment computation should include "patients who were entitled to benefits under Part A", we believe it is appropriate to include the days associated with Medicare patients who receive care at a qualified HMO.  Prior to December 1, 1987, we were not able to isolate the days of care associated with Medicare patients in HMOs and, therefore, were unable to fold this number into the calculation. However, as of December 1, 1987, a field was included on the Medicare Provider Analysis and Review (MEDPAR) file that allows us to isolate those HMO days that are associated with Medicare patients.  Therefore, since that time, we have been including HMO days in SSI/Medicare percentage.[63]  (Emphasis added.)

As explained in the FFY 2013 rulemaking, CMS' review of the records from the years immediately before the implementation of Part C demonstrated that the MedPAR data, used to calculate Medicare fractions for those years, included the days of patients enrolled in section 1876 HMOs.[64] However, the inclusion of the day required the submission of the no pay bill by the hospitals in the required format.  The Administrator finding by the agency and administrative decisions[65] issued upholding this policy, is in contrast to the Court's finding based on testimony in *Baystate Medical Center*, PRRB Dec. No. 2006-D20.

---

[62] It can be observed that both section 1886(d) of the Act (IPPS) and section 1876 (risk/cost based MCOs) are actually under Part E Miscellaneous Provisions, underlining that the Medicare Act is not so rigidly constructed that all of Part A provisions are literally under "Part A."

[63] 55 Fed. Reg. 35,990, 35994 (Sept. 4, 1990).

[64] *See* 78 Fed. Reg. 50619 (Aug 19, 2013).

[65] *Saint Anthony's Health Center*, Admin. Dec No. 2006-D22 (FYE 1997), which involved whether data other than

29

Prior to the FFY 2004 proposed rule, the 1990 language was the only authoritative agency interpretation relating to the treatment of patient days of individual enrolled in a managed care program which requires that they be "entitled to Part A". When Congress subsequently created Part C in the Balanced Budget Act of 1997 (BBA),[66] section 1876 HMO days were being counted in the Medicare fraction as a matter of explicit policy, and were correspondingly being excluded from the Medicaid fraction.   On January 1, 1999, patients enrolled in risk HMOs under section 1876 of the Act were automatically enrolled in Part C plans, indicating by Congresses' action the similarity or likeness of the two programs and in some instances the rates determined under section 1876 were used as a base rate under Part C.   At the time section 1876 was being phased out there were approximately the same number of beneficiaries participating in the program as would be eventually be participating in Part C in 2004, after a decrease and slow regaining of enrollment.[67] CMS issued no guidance discussing how the change in the type of HMO, from section 1876 to Part C would have affected the DSH calculation identifying no reason that the reorganization in the managed care structure, from section 1876 HMOs into Part C, would have any bearing on changing how a Medicare managed care day is counted in the DSH calculation.

Operationally, it appeared that the phasing out of the section 1876 managed care organizations along with the need to derive a risk adjustment methodology and reduce administrative burdens lead to changes in the collection and identification of data which failed to always account for the concurrent continuing data collection needs of the IPPS program.   The Administrator is mindful of the Court's finding of a prior practice of excluding the days from the Medicare fraction, (but the court did not find an explicit adoption of a legal interpretation of "entitled to benefits under Part A " or authoritative payment policy to exclude the days from the Medicare fraction) and respectfully notes that, with respect to CMS' prior practice, CMS had not always had the capacity to capture the Part C patient days as Medicare days, due to operational, not policy issues.   As discussed in the FFY 2013 IPPS final rule,[68] CMS has not identified any instructions, or policy, requiring the exclusion of the days from the Medicare fraction, or any policy statements or instructions, that the inpatient days for enrollees for Part C days were not to be treated as Part A days or that these dually eligible individuals were to be treated as not entitled to Medicare Part A benefits for purposes of the DSH payment calculation. Notably, after the

---

that of the MedPAR could be used to derive the SSI ratio Other final decisions include QRS 1995-1998 DSH Medicare HMO Days Groups, PRRB Dec No, 2011-D20; QRS 1994 DSH Managed Care and Medicaid Eligible Days Group, PRRB Dec. No. 2009D3 (December 17, 2008).
[66] Pub. Law 105-33, 111 Stat. 251 (Aug. 5, 1997)
[67] See Appendix.(http://www.resdac.org/resconnect/articles/114, "Medicare Managed Care Enrollees and the Medicare Utilization Files- Medicare Managed Care Enrollment" Table 1. Medicare Managed Care Enrollment Trends)
[68] 78 Fed. Reg. 50610 (August 19, 2013).

enactment of Part C prior to the 2004 statement, numerous Bulletins, Program Memorandums and preambles, were specifically issued regarding the Medicaid fraction for purposes of DSH, none of which stated or even suggested that the Part C days should be counted in the Medicaid fraction. Concurrent with this timeframe, CMS also was required to develop a section 1853 risk methodology, which it ultimately did through the collection of encounter data through new procedures and systems.[69] The hierarchy of Medicare data systems and their complicated interdependence may have cause unexpected results that did not involve affirmative policy decisions.[70]

Further, while the Providers pointed to the PM-A-98-21 as a clear showing of a policy to purposefully exclude days, a closer examination of that PM and its history and the history of encounter data requirements makes that far less evident. The Providers, as recognized by the Court, point to HCFA PM-A-98-21 as specifically providing that nonteaching hospitals were instructed to not submit no pay bills and, thus it is held as evidence of an explicit policy by CMS to not include Part C days in the Medicare DSH fraction as no pay billing was required to capture the days for DSH. The Administrator respectfully points out that that the PM A 98-21 does not address DSH payments. Instead, PM A-98-21, along

---

[69] See supra. The following is an example of the discrete language used in software programing (which does not mirror program policy language) and the unexpected programming interaction of data bases as explained on the CMS website for researchers, where an issue appears to have existed for MCO claims from 1997 through most of 2000 before it was detected and a "patch applied." ("Claim MCO Paid Switch"… a switch indicating whether or not a Managed Care Organization (MCO) has paid the provider for an institutional claim included the following Limitation: "DESCRIPTION: The MCO paid switch made consistent with criteria used to identify an inpatient encounter claim. BACKGROUND: During the NCH [national claims history] Version 'I' conversion, history was populated with an NCH Claim Type Code that will identify the record as an inpatient encounter claim. When applying the CWF [common working file] logic to identify an inpatient encounter claim, it was discovered that when all the criteria was met the MCO paid switch was sometimes a blank or '0' (reflecting that the MCO did not pay the provider). CORRECTIVE ACTION: With the inception of the Version 'I' processing (7/00), if all the criteria for identifying an inpatient encounter claim is met but the MCO paid switch is a blank or '0' it is changed to a 'I'. A patch code = '13' was applied to all claims back to 7/1/97 service year thru date.")
http://www.resdac.org/cms-data/variables/nch-claim-type-code.

[70] See, e.g. Change Request: 5647 (Date: July 20, 2007) (Subject: Capturing Days on Which Medicare Beneficiaries are Entitled to Medicare Advantage (MA) in the Medicare/Supplemental Security Income (SSI) Fraction.("In the past, hospitals were required to submit this information (through 1998) by submitting an informational only bill with no reimbursement associated. Later, managed care organizations (MCOs) (now MA companies) were responsible for submitting this information (through 2001) as part of Encounter Data. Since MAs are no longer required to submit encounter data, hospitals must submit data on their MA days so that these days may be included in the MedPAR file and be counted in the Medicare fraction of the DSH calculation.") In addition, in correcting the previous error, the interrelationship between the various data systems is reflected in the business instructions of Change Request 5647, which references four different system to correct the identified problem,  (See, e.g., "The Standard Systems shall accept informational only (Type of Bill (TOB) 11X) with Condition Code 04 from hospitals (including IPPS, IRF PPS, and LTCH PPS) for MA beneficiaries to ensure these days are captured in National Claims History and MedPAR…. The Common Working File shall ensure that days associated with IME claims containing both Condition Codes 04 and 69 are accepted and passed to both National Claims History and MedPAR.")

with a companion PM A-98-22, provided two related instruction: one was to affirmatively instruct teaching hospitals to use code 04 and the new code 69 in order to receive IME/GME payment[71] per the new statutory provisions and the companion PM was to more specifically instruct the processes for submitting section 1853 encounter data, first through a limited time direct hospital submissions and later through the managed care plans only.[72] The PM A-98-21 does not discuss any other payment purposes, but rather affirmatively discusses the "billing" for "MCO" encounter purposes (which became the MCO's sole responsibility starting on or after July 1, 1998) and, therefore, hospitals were instructed for the purposes of section 1853 *not to* submitted no pay bills to the intermediary, but rather "encounter data must be submitted by the plan to one of six selected intermediaries."   The encounter data billing submitted by the Plan (whether a section 1876 cost plan or Part C plan) to the intermediary was to reside in the common working file.[73]

While the Providers rely on PM-A-98-21 as evidence of an explicit policy, yet, the Court in *Loma Linda University Medical Center,* 684 F.Supp.2d 42 (D.C.D.C. 2010), found that the text of PM A-98-21 was not notice that the Part A claims process was implicated even for DGME and IME claims. The Court found that, regarding PM A–98–21, "Loma Linda is correct that there is no language ... regarding time limits, nor is there any mention of 42 C.F.R. § 424.44," the regulation governing deadlines for Part A claims.[74] Another words,

---

[71] HCFA Pub. 60A, Transmittal No. A-98-22, July 1, 1998. ("SUBJECT: Payment to Hospitals for Direct Costs of Graduate Medical Education (DGME) and Operating Indirect Medical Education (IME) Costs for Medicare+Choice Enrollees: This Program Memorandum outlines intermediary and standard system changes needed to process requests for IME and DGME supplemental payments for Medicare managed care enrollees. Sections 4622 and 4624 of the Balanced Budget Act of 1997 state that hospitals may now request a supplemental payment for operating IME for Medicare managed care enrollees.... PPS hospitals must submit a claim to the hospitals' regular intermediary in UB-92 format, with condition codes 04 and 69 present on record type 41, fields 4-13, (form locator 24-30). Condition code 69 is a new code recently approved by the National Uniform Billing Commission.")

[72] HCFA Pub. 60A, Transmittal No. A-98-22, July 1, 1998.  ("SUBJECT: Hospital Encounter Data Requirements From the Balanced Budget Act (BBA) of 1997 Background: Section 1853(a)(3) of the new Medicare+Choice program, created in §4001 of the BBA, requires Medicare+Choice organizations, as well as eligible organizations with risk-sharing contracts under § 1876, to submit encounter data. Data regarding inpatient hospital services are required for discharges on or after July 1, 1997. Section 1853(a)(3) also requires the Secretary to implement a risk adjustment methodology that accounts for variation in per capita costs based on health status. This payment must be implemented no later than January 1, 2000. Hospital data for discharges from the period July 1, 1997 • June 30, 1998 will serve as the basis for plan level estimates of risk adjusted payments. ....This Program Memorandum contains the requirements for intermediaries for processing claims for the period July 1, 1997 - June 30, 1998 and for the period after July 1, 1998.")

[73] See, e.g., 62 Fed. Reg. 67388-67389 (December 24, 1997)(Emergency Clearance: Public Information Collection Requirements Submitted to the Office of Management and Budget   (OMB))

[74]   *Loma Linda University Medical Center v. Sebelius,* 684 F.Supp.2d 42, United   States Court of Appeals, District of Columbia Circuit (December 2, 2010) 408 Fed.Appx. 3832010 WL 4903887.   .

in the DGME/IME context, a court has rejected that there was a "policy "communicated by the PM of a Part A, 42 CFR 424.44, filing requirement for teaching hospitals.  Yet, the PM, in not also explicitly discussing Part A timely filing of no-pay billing for nonteaching hospitals for purposes of DSH Medicare fraction, is used as evidence by the Providers[75] as an affirmative policy of excluding Part A days from the Medicare fraction of the DSH. The Administrator respectively submits that the issuance of PM A-98-21 does not give rise to evidence of a prior policy, but rather is evidence of a narrow standalone focus on the operational matter which was immediately at hand regarding DGME and IME payments for IPPS hospitals, the efficiency of which has been rejected by the courts. With respect to PM A-98-21, the agency also omitted the operational instructions for non-IPPS hospitals to receive payment for IME/DGME which the agency did not correct for several more years.[76]

As CMS explained in the FFY 2013 IPPS rule, when Part C was implemented as a means of controlling costs and enhancing benefits, CMS inadvertently no longer had the capacity to capture the days.  The Administrator respectfully maintains that the failure to include the days in the Medicare fraction was not the result of an authoritative agency legal interpretation or Medicare payment policy decision nor had CMS treated Part C days as days for patients "not entitled to benefits under Part A" for purposes of the DSH calculation. These operational issues persisted for a time even after CMS expressly clarified that Part C days should be counted in the Medicare fraction in the FFY 2005 IPPS rule, where in the August 12, 2005 rule, CMS stated that the MedPAR was capturing the MCO/Part C days putting forth that as one reason the MedPAR was preferred over the PS&R for the Medicare fraction data source, stating:

---

[75] The Providers' representatives were also involved in the litigation of this DGME/IME issue raising the same arguments criticizing the PM-A-98-21 lack of notice as to Part A billing requirements in Santa Barbara Cottage Hospital, PRRB Dec 2007-D78

[76] CHANGE REQUEST 2754   (Date: MAY 30, 2003) ( "SUBJECT: Payment to Hospitals and Units Excluded from the Acute Inpatient Prospective Payment System (IPPS) for Direct Graduate Medical Education (DGME) and Nursing and Allied Health (N&AH) Education for Medicare+Choice (M+C) Enrollees " ("This Program Memorandum (PM) outlines intermediary and standard system changes needed to process requests from hospitals and units excluded from the IPPS for DGME and N&AH education supplemental payments for M+C (managed care) enrollees. Transmittal A-98-21 issued in July 1998, explains the methodology for processing DGME and indirect medical education (IME) payments associated with M+C enrollees effective January 1, 1998,… However, because hospitals do not bill for managed care days associated with non-IPPS discharges, the methodology outlined in Transmittal A-98-21 has not allowed non-IPPS hospitals and hospitals with non-IPPS units to submit claims for M+C enrollees and receive the appropriate DGME payment. Therefore, this transmittal modifies Transmittal A-98-21 to permit these non-IPPS hospitals and units to submit their M+C claims to their respective intermediaries to be processed as no-pay bills so that the M+C inpatient days can be accumulated on the Provider Statistics & Reimbursement Report (PS&R) (report type 118) for DGME payment purposes through the cost report.")

> We believe it is appropriate to continue to use the MedPAR for Medicare
> DSH calculations. Principally, as documented in the Federal Register, the
> MedPAR system has been the Medicare Part A data source for the Medicare
> DSH calculation since the implementation of the DSH adjustment. .... The
> MedPAR system contains utilized days and the PS&R contains days paid to
> the provider by Medicare. The PS&R does not contain certain types of days
> that should be included in the denominator of the Medicare fraction, such as
> covered days that were paid by a Medicare managed care organization
> ("MCO").[77]

CMS never considered the days of patients enrolled in Part C plans to be non-Medicare days
as a matter of either legal interpretation or policy. Intermediaries were consistently
continuing to excluded these days from the Medicaid fraction under regular auditing
procedures, with the issue as to the counting of Part C days not finding its way through the
administrative process until 2007 wherein the Administrator agreed with the Board that the
days should not be included in the Medicaid fraction and should be included in the Medicare
fraction.[78]

CMS has since taken action to ensure that CMS is collecting the data necessary to include
these days in the Medicare fraction. In correcting this operational issue, CMS reminded
contractors through the CMS issued Change Request 6329 on March 6, 2009, and Change
Request 5647 on July 20, 2007, to instruct hospitals to submit informational claims for Part
C patients for FFY 2006 and FY 2007 and subsequent periods when it was brought to CMS'
attention that hospitals were not submitting these claims, and contrary to the regulations,
CMS was administratively unable to include these Part C days in the Medicare fraction.
Furthermore, CMS issued Change Request 5647 to provide hospitals additional time to
submit FFY 2007 claims when it was brought to CMS attention that compliance with the
policy was uneven, partly due to the fact that teaching hospitals had a financial incentive to
submit these claims because they receive indirect medical education (IME) payments for
MA discharges, while nonteaching hospitals receive no additional IME payment.

Accordingly, the Administrator finds that the Providers are incorrect insofar as they
suggested that including Part C days in the Medicare fraction, and excluding them from the

---

[77] 70 Fed. Reg. 47278, 47440 (Aug. 12, 2005).

[78] *See* Administrator Decision in St *Joseph's Hospital, St John's Northeast Hospital*, PRRB Decision 2007-D68
(FYEs 1998-2000) (November 13, 2007(modifying PRRB decision (Sept 14, 2007).

Medicaid fraction, represents a reversal of prior policy.[79] A review of the CMS records shows that the days were not captured due to operational issues and not because of an authoritative    policy    to treat the days as non-Medicare days, and there was no longstanding policy or practice to include them in the numerator of the Medicaid fraction as days for individuals not entitled to Medicare Part A benefits.   The Administrator finds that it has never been CMS policy for Part C days to be included in the numerator of the Medicaid fraction, nor has CMS included such days in the numerator of the Medicaid fraction.

B. Part C enrollees are "entitled to benefits under Part A" and enrollment in Part C does not dis-entitle a Medicare beneficiary to Medicare Part A benefits

In addition to the foregoing arguments, the Providers point to the statute for support of the inclusion of the days in the numerator of the Medicaid fraction instead of the numerator and denominator of the Medicare fraction.   The Providers first argue that Part C enrollees are not entitled to benefits under Part A and, therefore, should be excluded from the Medicare fraction. The Providers argue that section 226(c)(1) of the Act, 80 states "entitlement of an individual to hospital insurance benefits for a month [under Part A] shall consist of entitlement to have payment made under, and subject to the limitations in, [P]art A . . . ." Entitlement, the Providers maintained, is inextricably linked to "payment" and payment is not made "under Part A" for the Part C enrollees. Thus, the enrollees should not be included in the Medicare fraction. Second, in a related argument, the Providers argue that section 1851(a)(1) of the Act, states that the persons eligible for Medicare Advantage are "entitled to elect to receive benefits" either "through the original [M]edicare fee-for-service program under [P]arts A and B, or through enrollment in a [Medicare Advantage] plan under [Part C]." Thus, an individual is either entitled to fee-for- service under Part A or enrollment

---

[79] Further, the Providers allege they have been disadvantaged as they forecasted certain DSH payments based on a policy of including days in the Medicaid fraction: however, *inter alia*, in addition to the foregoing review of CMS policy prior to the 2003 proposed rule (which shows no explicit policy statement upon which the Providers could rely), the reasonableness of such a forecast based on the inclusion of days in the Medicaid fraction made by a prudent business would be questioned for this cost year in light of the fact CMS explicitly stated in 2005 that Part C patients should be included in the Medicare fraction and contractors had been consistently excluding the days  from the Medicaid fraction prior to the cost year in this case (and evident in much litigation and appeals) and that the Providers never contend that they had received payment based on CMS' explicit approved acceptance of the inclusion of the days in the Medicaid fraction in prior years. Generally, providers have also determined and challenged the inadvertent omission of SSI days when it is to their individual benefit to do so.

[80] Section 226(c) states that:  "For purposes of subsection (a)— (1) entitlement of an individual to hospital insurance benefits for a month shall consist of entitlement to have payment made under, and subject to the limitations in, part A of title XVIII on his behalf for inpatient hospital services, post-hospital extended care services, and home health services (as such terms are defined in part C of title XVIII) furnished him in the United States (or outside the United States in the case of inpatient hospital services furnished under the conditions described in section 1814(f)) during such month...."

through Part C and therefore one excludes the other. Therefore, a Part C enrollee cannot also be entitled to Part A and therefore cannot be included in the Medicare fraction.

By statute, under section 1851, in order to enroll in Medicare Part C, or to change from one Part C plan to another Part C plan offered under Part C, a beneficiary must be "entitled to benefits under Part A and enrolled under Part B".[81] Thus, by definition, a beneficiary must be "entitled" to Part A to be enrolled in Part C. There is nothing in the Act that suggests that beneficiaries who enroll in a Medicare Part C plan forfeit their entitlement to Medicare Part A benefits. To the contrary, a beneficiary who enrolls in Medicare Part C is entitled to receive benefits under Medicare Part A through the Part C plan in which he or she is enrolled, and the MA organization's costs in providing such Part A benefits through Part C are paid for by CMS with money from the Medicare Part A Trust Fund (i.e., Federal Hospital Insurance Trust Fund.). Even where Medicare beneficiaries elect Medicare Part C coverage, they are still entitled to benefits under Medicare Part A. Therefore, if an Part C beneficiary is also an SSI recipient, the patient days for that beneficiary should be included in the numerator of the Medicare fraction, as well as in the denominator of the Medicare fraction and not in the numerator of the Medicaid fraction because individuals enrolled in Part C plans are "entitled to benefits under part A" as the phrase is used in the DSH provisions at section 1886(d)(5)(F)(vi)(I) of the Act.

This understanding of the term "entitled" to benefits under part A, is consistent with section 226(a) of the Act, which provides that an individual is automatically "entitled" to Medicare Part A when the person reaches age 65, or becomes disabled, provided that the individual is entitled to Social Security benefits under section 202 of the Act. Thus, contrary to the Providers assertions that a Part C enrollee is no longer entitled to benefits, individuals who are enrolled in MA plans provided under Medicare Part C continue to meet all of the statutory criteria for entitlement to Medicare Part A benefits under section 226 of the Act. Congress uses the phrase "entitled to benefits under part A" to consistently refer to an individual's status as a Medicare beneficiary. Further evidence of this "use" of the term as referring to the status as a Medicare Part A beneficiary is that the phrase "entitled to benefits under [Medicare] part A" is set forth in multiple other sections of the Medicare statute, indicating that the phrase has a specific, consistent technical term of art meaning throughout the statutory scheme and not a varying, context-specific meaning in each section and subsection. Notably, enrolling in Part C does not change an enrollee's status as a Medicare beneficiary and does not remove or reduce any benefits the beneficiary would otherwise have received as the Part C plan must provide the benefits to which the beneficiary is entitled under Part A and may provide additional benefits as described by section 1852(a)(1)(A) of the Act.

---

[81] Section 1852(a)(1)(B)(i) of the Act.

In addition, as noted in the foregoing, "payment" for the service is not the focus of the phrase at issue, but rather the focus is on entitlement to the benefit in determining the proper inclusion in the DSH formula. Section 1886(d)(5)(F)(vi)(I) of the Act specifically notes that the numerator of the Medicare fraction must reflect patient days for patients "entitled to benefits under part A" who are also "entitled to supplementary security income benefits (excluding any State supplementation) under title XVI of this Act." Moreover, entitlement to Medicare Part A is different from entitlement to SSA benefits as SSA is a cash benefit. Unlike "entitlement" to Medicare Part A, the "entitlement" to SSI benefits, section 1602 of the Act states that "Every aged, blind, or disabled individual who is determined under part A to be eligible on the basis of his income and resources shall, in accordance with and subject to the provisions of this title, be paid benefits by the Commissioner of Social Security." Because SSI is a cash benefit, only a person who is actually paid these benefits can be considered "entitled" to these benefits. This differs from entitlement to Medicare benefits under Part A, a distinct set of health insurance benefits described under section 1812 of the Act, including coverage of inpatient hospital, inpatient critical access hospital, and post-acute care services as well as post-institutional home health and hospice services under certain conditions. For purposes of section 226(c)(1) of the Act, beneficiaries enrolled in Part C are having payment made for the month in question, through the Part A component of the monthly payment made to the MA organization, and are receiving Part A benefits subject to the limitations on such benefits provided for in Part A.[82] Thus, the Administrator disagrees that Medicare beneficiaries enrolled in Part C no longer receive benefits under Part A when the providers are not paid for the services directly under Part A and further disagrees that because the payment structure of Part C applies (in that CMS pays the Part C plans so that the plans may make payment to providers for the care of the beneficiaries) those beneficiaries are not entitled to Part A benefits.

The interpretation offered by the Providers is problematic when applied to the plain text of the Medicare statute. As the court noted in Northeast, the interpretation of enrollment in Part C as dis-entitling a beneficiary from "entitlement for benefits under Part A" becomes operationally difficult as the individual once enrolled in Part C would cease to be Plan C eligible upon electing that option. Other problematic sections are evident if the Providers' interpretation is applied to the statute. Section 1851(d)(2)(A) requires the Secretary to mail "each [Part C] eligible individual" information about available Part C

---

[82] If Congress wanted to inextricably link the counting of the day with the payment it could have stated that the Medicare fraction was limited to days in which patients were entitled to "have payment made with respect to such services under part A ", as it did when addressing Part B at section 1833(d) of the Act in stating that, regarding the nonduplication of payments, "no payment may be made under part B with respect to services to any services furnished an individual to the extent such individual is entitled ... to have payment made with respect to such services under Part A "

plans, including "[a] list identifying the [Part C] plans that are (or will be) available to residents of the area," before the start of each annual open enrollment period. If [Part C] enrollees are no longer "eligible" for Part C once they enroll, this means the Secretary is not required to mail them this information, even though the purpose of the open enrollment period is to allow beneficiaries to change plans... Part C options change every year, which is undoubtedly why the Act requires the Secretary to update the information she sends out annually "to reflect changes in the availability of [Part C] plans and the benefits and . . . premiums for such plans." ... An anomalous result of the Providers' interpretation is that the plan would not be required to mail such information to persons who are enrolled in Part C.   Further, under section 1852(c)(2) of the Act[83] pursuant to the Providers' interpretation a Part C plan must provide general plan information "upon request" to non– Part C enrollees, but need not provide such information upon request to persons enrolled with a different Part C plan, although both are as likely to be interested in learning about options.[84]   Section 1851(h)(1), which prohibits Part C plans from distributing marketing materials to Part C "eligible individuals" unless the plans first submit the materials to the Secretary for review, yet under the Providers' interpretation the plans would be prohibited from sending unreviewed marketing materials to non-Part C enrollees but free to do so to individuals already in an part C plan, because those individuals would no longer be Part C "eligible individuals" though both represent vulnerable populations.   In addition, sections 1854(e)(1)(B) and (e)(4)(B) limit the average premiums, deductibles, and copayments Part C enrollees pay for certain benefits to the average amounts "individuals entitled to benefits under [P]art A . . . and enrolled under [P]art B" would pay for those same benefits "if they were not members of a [Part C] organization for the year." These provisions assume it is possible to be both entitled to benefits under Part A and enrolled in a Part C plan.

Further, section 1905(p)(1) provides that a person "entitled to hospital insurance benefits under [P]art A" who meets certain income requirements is a "qualified [M]edicare beneficiary," while section 1852(a)(7) states that a "qualified [M]edicare beneficiary . . . who is enrolled in a specialized [M+C] plan for special needs individuals" may not be charged costs above a certain amount. Together these two provisions indicate that a person can be both "entitled to benefits under Part A" and enrolled in Part C. Section 1857(e) authorizes the Secretary to charge fees to Part C plans to help recoup the costs of distributing information about Part C options and sets forth a formula which basically is mathematically nonsensical if read under the Providers; interpretation and MA enrolled

---

[83] Provision requiring Part C organizations to provide "general coverage information and general comparative plan information" to Part C "eligible individual[s]" upon request.
[84] Various other provisions also presume that a person who enrolls in Part C remains entitled to benefits under Part A. See also section 1851(a)(3)(A), (e)(2)(D), (h); section 1852(a)(7), (c)(2); section 1853(o)(3)(B)(ii); section 1854(e)(1)(B), (e)(4)(B); section 1857(e); section 1858(f)(4)(A).

are not treated as also entitled to benefits under Part A (that is, if MA enrollees are divided by individuals entitled to Part A benefits–minus the Part C enrollees population.)

In addition, contrary to the Providers' argument, Congress has consistently referred to beneficiaries that are entitled to benefits under Part A and are not enrolled in Medicare Part C suggesting that enrollment in Part C does not cancel out the entitlement to Part A. For example, it would be redundant for Congress to state that an individual must be entitled to benefits under Part A and not enrolled in Part C program if it was an "either or situation" and one status necessarily preludes the other.[85]   Likewise, a provision governing payment to independent laboratories for providing the technical component of physician services, Congress defined the "term 'fee-for-service medicare beneficiary' [to mean] an individual who . . . is entitled to benefits under part A, or enrolled under part B, or both, of such title; and . . . is not enrolled in [a] [] plan under part C of such title."[86]

The Court in *Northeast* rejected any significance to the fact that the DSH fractions speak of eligibility for Medicaid, but entitlement to Medicare and rejected that the Congress's use of the two terms indicates it intended different meanings (i.e., "entitled" is intended to mean something different from "eligible") stating that, "to the extent that the Congress was merely borrowing these terms from elsewhere in the statute, it would be a mistake to read too much into the difference in nomenclature." The Court also recognized that the Secretary's interpretation does not actually collapse the terms "entitled" and "eligible", as an individual maybe "eligible" to enroll in Part A and that after enrolling become "entitled to benefits" referring to the language relating to certain classes of Medicare beneficiaries. The Court also observed that in earlier cases discussing the difference between the terms by the courts is dicta and would not be applicable in this case and that courts, after close examination, have not determined a reason for the different terms used in the programs.

---

[85]  See, e.g., "Section 1866B (a) General Administrative Authority.—(1) Beneficiary eligibility.—Except as otherwise provided by the Secretary, an individual shall only be eligible to receive benefits under the program under section 1866A (in this section referred to as the "demonstration program") if such individual—(A) is enrolled under the program under part B and entitled to benefits under part A; and(B) is not enrolled in a [] plan under part C...."). See also section 1866E (42 U.S.C. § 1395cc-5(d)) (defining applicable beneficiary to mean "an individual who . . . is entitled to benefits under part A and enrolled for benefits under part B . . . [and, among other criteria] is not enrolled in a Medicare Advantage plan under part C.")

[86]  See Medicare Improvements for Patients & Providers Act of 2008, Pub. L. No. 110-275, 122 Stat. 2494, 2540, Title I, Subtitle C, Part I, § 136, amended by Patient Protection & Affordable Care Act, Pub. L. No. 111-148, Title III, Subtitle B, Part I, § 3104, 124 Stat. 119, 417) (March 23, 2010) ( 42 U.S.C. § 1395w-4)

C. The Medicare beneficiary enrolled in Part C is still receiving Part A services and benefits paid from the part a trust fund

The Providers also argued that section 1851(i)(1) of the Act, states that "payments under a contract with a [MA] organization . . . with respect to an individual electing a [MA] plan . . . shall be instead of the amounts which (in the absence of the contract) would otherwise be payable under [P]arts A and B . . . ." Thus, the Providers contend that because individuals who enroll in an MA plan receive benefits under Part C and not Part A, they cannot be "entitled" to benefits under Part A because the individual no longer received benefits under Part A. The Providers argue that beneficiaries are not "entitled" to benefits as the Providers argue the law denies these benefits. Therefore, as payment is made under Part C is instead of payment under Part A, the Part C enrollees are not entitled to benefits under Part A.

However, the Administrator finds that, with respect to the phrase "entitled to benefits under part A", for purposes of section 1851(a)(1) of the Act, the "benefits" referenced in the phrase "entitled to elect to receive benefits" are the benefits provided for in Part A and Part B. Thus, this language confirms that beneficiaries enrolled in Part C remain "entitled to" benefits under Part A and thus supports this foregoing interpretation of the statute. It is only the means "through" which such Part A benefits are received that changes, from the "fee-for-service" method set forth in Part A, to the capitation payment method set forth in Part C. In particular, section 1851(i)(1) of the Act similarly refers only to whether Part A benefits are provided through payments to, and by, the MA organization, or direct payments made under the "fee-for-service" payment procedures provided for in Part A and Part B. It is only the means by which the furnishing of these benefits are paid that is distinguished and not the entitlement to such benefits. That is, whether an individual is entitled to benefits under Part A is different from how the provider is paid for the services.

Further evidence of the Part C enrollees continued entitlement to Part A benefits, is that under certain circumstances, Medicare Part A pays directly for care furnished to patients enrolled in Medicare Part C plans, rather than indirectly through Medicare Part A Trust Fund payments to MA organizations. For example, if, during the course of the year, the scope of benefits provided under Medicare Part A expands beyond a certain cost threshold due to Congressional action or a national coverage determination, Medicare Part A Trust fund will pay the provider directly for the cost of those services.[87] Similarly, Medicare Part A also pays directly for care furnished to patients enrolled in Medicare Part C plans, for federally qualified health center services and hospice care furnished to Part C patients.[88] The hospice benefit is a significant part of the benefits available under Part A that is always

---

[87] Section 1852(a)(5) of the Act.
[88] Sections 1853(a)(4) and 1853(h)(2) of the Act, respectively

paid for on a fee-for-service basis, even if the beneficiary is enrolled in an MA plan. These statutory provisions are contrary to the assertion that beneficiaries enrolled in MA plans are not "entitled to benefits under Part A" and make clear that beneficiaries enrolled in MA plans continue to be "entitled to benefits under Part A."[89] A patient enrolled in a Part C/MA plan remains entitled to benefits under Medicare Part A and should be counted in the Medicare fraction of the disproportionate patient percentage and not the Medicaid fraction.

D. In enacting Part C, Congress did not indicate these days should be included in the Medicaid fraction and neither equity, nor public policy, support including the days in the Medicaid fraction

The Providers also argued that congressional intent, the public interest, and the equities all demand that patients whose care is paid by Part C, cannot be considered "entitled to benefits" under Part A for purposes of the disproportionate share hospital adjustment to Part A prospective payment per discharge.   The Providers maintained that in support of its position, section 1886(d)(5)(F) of the Act has not undergone any significant amendments since its enactment, and was never amended to explicitly address the creation of Medicare Part C.   Although a patient must at some point be entitled to benefits under Part A in order to be eligible to enroll in Part C, once an enrollee has chosen Part C, he or she is no longer entitled to Part A benefits and instead, the payment structure in Part C applies, and CMS pays Part C organizations for those beneficiaries, while the Part C organizations pay the providers. The Provider contended that this was evidence that Congress did not intend to include Part C days in the Medicare fraction because if it had, Congress could have easily revised the DSH statute to indicate as such and Part C days should be excluded from the Medicare fraction because the services paid for under Part C cannot also result in a patient being entitled to benefits for those services under Part A.

The Administrator finds that there is no basis to presume that Congress intended to so radically alter the DSH calculation methodology when it enacted Medicare Part C.[90] That is, under the Providers' reading, after enactment of the BBA, whether a day would be counted in the Medicare fraction would depend on whether a beneficiary on a year to year

---

[89] *See. e.g.*, section 1852(a)(5) which provides that payment under the Part C contract 'shall be in amounts which in the absence of the contract would otherwise be payable under parts A and B" becomes inapplicable and Medicare pays the provider directly for the cost of the services if the scope of the benefits under Part A expands beyond a certain threshold during the course of the year. Section 1851(i)(1) does not apply to services provided by federally qualified health centers or hospices, sections 1853(a)(4), 1853(h).

[90] For example, a review of the Table 1. Medicare Managed Care Enrollment Trends, would show that this policy would result in the significant reduction in the Medicare population counted in the Medicare fraction and would be subject to as much as 10 percent fluctuations in all beneficiaries being counted in the Medicare fraction over a short period of years, (see 2002--13.6 percent enrolment; 2009-24.2 percent enrollment.)

basis chose to enroll in Part C or dis-enroll in Part C even though entitlement to Part A was unchanged throughout this period. Further, there is no reason Congress would not have been aware of the fact that MCO/HMO days, prior to enactment of Part C, under CMS policy would have been included in the Medicare fraction. Inclusion of the day in the Medicare fraction is also not contrary to the intent of the establishment of Part C (to enhance cost efficiencies and beneficiaries' Part A services) or the DSH payment.

The fact that Congress enacted the program without amending the DSH formula is also not dispositive of the Providers' interpretation as meaning Congress intended a new way of counting DSH days. The BBA which established Part C did not specifically address DSH and thus it is reasonable and appropriate that Part C patients should be counted in the Medicare fraction after its enactment. The BBA provided that, to enroll in a Part C plan, an individual must be "entitled to benefits under part A", which is the same language used in the DSH provision. The individuals that are enrolled in Part C plans continue to meet the age and disability requirements for entitlement to benefits under Medicare Part A and, thus, should be included in the Medicare fraction. The Administrator finds that the enactment of the current provisions in Medicare Part C authorizing an alternative way of receiving Part A benefits did not alter the criteria for entitlement to such benefits, any more than did earlier, similar provisions in section 1876 of the Act that were enacted in 1972 and amended in 1982. The language in section 1876 made clear that a beneficiary was still "entitled to benefits under Part A" while receiving Part A benefits through a private health plan paid by CMS to provide them because section 1876 provided for two classes of enrollees, one only enrolled in Part B, and another "entitled to benefits under Part A" and enrolled in Part B, and provided for Part A Trust Fund payments in the latter case, and only Part B payments in the former. There is no support for the conclusion that Part C enrollees are not similarly "entitled to benefits under Part A" on an ongoing basis. These days were historically included in the Medicare fraction.

Further, among other things, due to differences in how the various States administer their Medicaid programs, not all patients who are entitled to SSI are also eligible for Medicaid.[91] Thus, adopting the Providers' reading would result in some patients entitled to SSI and Medicare Part A not being counted in the numerator of either of the DSH fractions, thereby altering the DSH adjustment figure so that it no longer serves its intended purpose to quantify the portion of low-income persons being served.

---

[91] See section 1902(f) of the Act (42 U.S.C. § 1396a(f)) (providing that states may elect to provide Medicaid assistance only to those individuals who would have been eligible under the state Medicaid plan in effect on January 1, 1972, and not provide Medicaid to all Federal SSI recipients).

The Providers also maintained that placing the days in the Medicare fraction would be against public policy and equity as it unnecessarily distorts the disproportionate share patient percentage because of the higher proportion of wealthier individuals enrolled in Part C and, therefore, causing a dilution of the Medicare fraction and distortion that was averse to providers and contrary to congressional intent. This occurs because with respect to the Medicare fraction the numerator is the number of patient days for patients who were entitled to benefits under Part A and were entitled to supplemental security income benefits (i.e., low income) while the denominator is the total number of "patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under Part A. Hence, if there were an alleged higher proportion of wealthier Part C patients included in the denominator of the Medicare faction, with the smaller number of Part C SSI patients included in the numerator, pursuant to the Providers' argument, the percentage of low income patients for that proxy would be diluted.

However, the Medicare Current Beneficiary Survey has shown that Part C enrollees tend to have lower incomes at similar rates as Medicare beneficiaries who are not enrolled in Part C and, thus, would not be disproportionately likely not to meet the income eligibility requirement for SSI benefits.[92] That is, this policy does not result in a disproportionate distortion of the disproportionate patient percentage or have a result that would be contrary

---

[92] See e.g. Medicare Current Beneficiary Survey (MCBS).
https://www.cms.gov/Research-Statistics-Data-and-Systems/Research/MCBS/Data-Tables.html

The relevant information is set forth at "Table 1.6 Demographic and Socioeconomic Characteristics of Noninstitutionalized Medicare Beneficiaries, by Insurance Coverage"
Table 1.6 Demographic and Socioeconomic Characteristics of Noninstitutionalized Medicare Beneficiaries, by Insurance Coverage" for Year 2004
Table 1.6 Demographic and Socioeconomic Characteristics of Noninstitutionalized Medicare Beneficiaries, by Insurance Coverage" for Year 2005
Table 1.6 Demographic and Socioeconomic Characteristics of Noninstitutionalized Medicare Beneficiaries, by Insurance Coverage" for Year 2006
Table 1.6 Demographic and Socioeconomic Characteristics of Noninstitutionalized Medicare Beneficiaries, by Insurance Coverage" for Year 2007.
Table 1.6 Demographic and Socioeconomic Characteristics of Noninstitutionalized Medicare Beneficiaries, by Insurance Coverage" for Year 2008.
Table 1.6 Demographic and Socioeconomic Characteristics of Noninstitutionalized Medicare Beneficiaries, by Insurance Coverage" for Year 2009
Table 1.6 Demographic and Socioeconomic Characteristics of Noninstitutionalized Medicare Beneficiaries, by Insurance Coverage" for Year 2010.
Table 1.6 Demographic and Socioeconomic Characteristics of Noninstitutionalized Medicare Beneficiaries, by Insurance Coverage" for Year 2011.
Table 1.6 Demographic and Socioeconomic Characteristics of Noninstitutionalized Medicare Beneficiaries, by Insurance Coverage" for Year 2012.
See also letter explaining corrections to some years' income data. CMS also published statistics at 78 Fed. Reg. 50615 (Aug 19, 2013).

to the Congressional purpose of the DSH payment in its effect.[93] Regardless, Congress gave no indication it intended to exclude an entire annually changing class of Medicare Part A benefit entitled beneficiaries from the Medicare proxy because of enrollment in Part C.[94]

Further, the Providers also incorrectly asserted that the days of patients enrolled in Part C should not be included in the Medicare/SSI fraction because the DSH calculation does not

---

[93]   As a respectful observation, that the Secretary described the financial impact of the proposed rule as not significant does not necessarily indicate it was proposing to adopt an existing policy but rather that the Secretary apparently considered the proposed policy in the aggregate would be "neutral" which was reasonable in light of the actual documented income similarities between the beneficiaries in Part C and Fee-for service Medicare. The cost year in this case represents the beginning of a boost in the Part C enrollment. Because of the relatedness of the programs, CMS also would not necessarily have identified a significant impact if the pre-Part C policy were maintained and counting Medicare managed care days in the Medicare fraction.

[94]   Moreover, other factors such as a hospital's respective payor mix may have attributed to variations on the impact among hospitals.   In addition, other data supports that Part C attracts enrollees that are healthier, younger, and lower income as a group, than traditional fee-for-service (FFS) Medicare beneficiaries. When those days are excluded from the fraction, as the Providers propose, the impact on DSH of the movement of a healthier Medicare "subgroup" to Part C managed care has not been considered or researched.   It is possible that SSI/Medicare FFS beneficiaries (low income and non-Part C) have a disproportionately higher utilization rate compared to all Medicare FFS beneficiaries, whereas the overall theoretically "healthier" SSI/Medicare Part C patients may have inpatient utilization rates in line with /or like that of all Medicare Part C patients, thereby, in hindsight, possibly having the effect of "diluting" the SSI ratio when Part C days are included in the Medicare/SSI fraction. (That is, as an example, if Part C and Medicare FFE pool of beneficiaries, respectively, each have five percent SSI beneficiaries (assuming income similarity), if the Medicare FFS/SSI utilizes seven percent of the total FFS inpatient days and the Part C/SSI utilize five percent of the total Part C inpatient days, the latter will "dilute" the former to some extent depending on the ratio of Part C days to FFS days.) Regardless putting the days in the Medicaid fraction is a sum certain gain as the days are always already included in the total inpatient days.
See e.g., http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1361041/ ("The Effect of Benefits, Premiums, and Health Risk on Health Plan Choice in the Medicare Program", Adam Atherly, Bryan E Dowd, and Roger Feldman (Aug 2004)   ("The previously cited studies have found that younger, healthier, and lower-income beneficiaries are more likely to join managed care plans");
http://www.pnhp.org/news/2013/february/cms-shows-that-the-healthy-go-in-and-the-sick-come-out-of-                ("CMS shows that the healthy go in and the sick come out of Medicare Advantage plans: Impact of Continued Biased Disenrollment from the Medicare Advantage Program to Fee-for-Service" (February 4, 2013) Gerald F. Riley, Centers for Medicare & Medicaid Services, Medicare & Medicaid Research Review , 2012: Volume 2, Number 4) ("Background: Medicare managed care enrollees who disenroll to fee-for-service (FFS) historically have worse health and higher costs than continuing enrollees and beneficiaries remaining in FFS.");
  http://blog.academyhealth.org/a-medicare-advantage-literature-update/ ("A Medicare Advantage literature update" by The Incidental Economist on April 28, 2015 )(" Two recent studies of Medicare Advantage (MA) assess its cost and value. In Health Affairs, Brian Biles, Giselle Casillas, and Stuart Guterman largely examine its costs. In an NBER working paper, Vilsa Curto and colleagues also consider its value, among other things.*** Curto et al. acknowledge that risk adjustment does not fully account for the differences in MA vs. traditional Medicare populations.....[M]ortality rates in MA are below those of traditional Medicare, suggesting the former serves healthier beneficiaries.(http://www.nber.org/papers/w20818        ("Can Health Insurance Competition Work? Evidence from Medicare Advantage," Vilsa Curto, Liran Einav, Jonathan Levin, Jay Bhattacharya, NBER Working Paper No. 20818, Issued in December 2014 )

include patient days in hospital units excluded from the IPPS but paid under Part A. contrary to the Providers' suggestions, the regulation at 42 CFR §412.106(a)(1)(ii) limits the patient days used in determining a hospital's DSH payment to patient days "attributable to units or wards of the hospital providing acute care services generally payable under the [inpatient] prospective payment system" and is not dispositive of this issue and is not applicable to a particular "fraction."[95]   Patient days associated with beds in excluded distinct part hospital units are explicitly excluded from the DPP calculation in accordance with 42 CFR §412.105(a)(1)(ii)(A). In contrast, the days for Part C beneficiaries that are counted in the Medicare/SSI fraction are days on which those beneficiaries received care that would be (and in some cases actually was) payable under IPPS. Accordingly, CMS' policies regarding patient days in excluded distinct part units provide no reason to treat Part C enrollees differently than other patients also entitled to benefits under Part A when attributable to the units or wards of the hospital providing acute care inpatient services.

In sum, the Administrator concludes that the inclusion of Part C enrollees in the Medicare/SSI fraction is consistent with congressional intent to include individuals entitled to both Medicare Part A and SSI benefits and results in a more consistent proxy for low income to be used for the Medicare DSH calculation. Thus, the Administrator determines that the disproportionate share adjustment computation should include the days associated with Medicare patients who receive care through a Part C plan in the numerator and denominator of the Medicare fraction.

---

[95]  Another words, it would seem the interpretation of an inpatient day under the Providers' theory would require the days not be included in either fraction.

## DECISION

The Administrator determines that the days associated with Medicare patients who are enrolled in a Part C plan are to be included in the numerator and denominator of the Medicare fraction for the Providers' cost years involved in this case.


THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE
SECRETARY OF HEALTH AND HUMAN SERVICES


Date: 12/1/15

Patrick Conway, M.D., MSc
Acting Principal Deputy Administrator
Centers for Medicare & Medicaid Services

46

# Appendix:

## Research Data Assistance Center

http://www.resdac.org/resconnect/articles/114,

"Medicare Managed Care Enrollees and the Medicare Utilization Files- Medicare Managed Care Enrollment" **Table 1.**
Medicare Managed Care Enrollment Trends)

Trends in Medicare managed care enrollment have fluctuated since its inception. Prior to the introduction of the Medicare prescription drug program (Medicare Part D), Medicare managed care enrollment peaked in 1999 with over 17% of the Medicare beneficiaries enrolled in a managed care plan. In the early 2000s, Medicare managed enrollment slowly declined to just below 15% in 2005. However, following the establishment of Medicare Part D in 2006, Medicare managed care enrollment has steadily risen again to nearly 24% of all Medicare beneficiaries. Table 1 presents Medicare managed care enrollment trends from 1985 to 2009.

**Table 1.** Medicare Managed Care Enrollment Trends

Medicare Managed Care Enrollment

Enrollment by Plan Type for Years 1985-2010

| Year (a) | Risk Based Enrollment | Risk Based % of Total | Cost Based Enrollment | Cost Based % of Total | Total Mgd Care Enrollment | Total Mgd Care % of Total | Total Medicare Enrollment | % of Total |
|---|---|---|---|---|---|---|---|---|
| 1985 | 497,654 | 1.6% | 773,399 | 2.5% | 1,271,053 | 4.1% | 31,082,801 | 100.0% |
| 1986 | 892,976 | 2.8% | 711,173 | 2.2% | 1,604,149 | 5.1% | 31,749,708 | 100.0% |
| 1987 | 1,084,670 | 3.3% | 718,196 | 2.2% | 1,802,866 | 5.6% | 32,411,204 | 100.0% |
| 1988 | 1,134,875 | 3.4% | 671,130 | 2.0% | 1,806,005 | 5.5% | 32,980,033 | 100.0% |
| 1989 | 1,161,513 | 3.5% | 681,041 | 2.0% | 1,842,554 | 5.5% | 33,579,449 | 100.0% |
| 1990 | 1,280,839 | 3.7% | 736,754 | 2.2% | 2,017,593 | 5.9% | 34,203,383 | 100.0% |

| 1991 | 1,407,270 | 4.0% | 749,666 | 2.1% | 2,156,936 | 6.2% | 34,870,240 | 100.0% |
|------|-----------|------|---------|------|-----------|------|------------|--------|
| 1992 | 1,587,511 | 4.5% | 769,549 | 2.2% | 2,357,060 | 6.6% | 35,579,149 | 100.0% |
| 1993 | 1,833,115 | 5.0% | 798,591 | 2.2% | 2,631,706 | 7.2% | 36,305,903 | 100.0% |
| 1994 | 2,290,706 | 6.2% | 764,892 | 2.1% | 3,055,598 | 8.3% | 36,935,366 | 100.0% |
| 1995 | 3,108,122 | 8.3% | 704,648 | 1.9% | 3,812,770 | 10.2% | 37,535,024 | 100.0% |
| 1996 | 4,160,252 | 10.9% | 627,703 | 1.6% | 4,787,955 | 12.6% | 38,064,130 | 100.0% |
| 1997 | 5,300,819 | 13.8% | 594,408 | 1.5% | 5,895,227 | 15.3% | 38,444,739 | 100.0% |
| 1998 (c) | 6,534,801 | 16.8% | 224,741 | 0.6% | 6,759,542 | 17.4% | 38,824,855 | 100.0% |
| 1999 | 6,679,174 | 17.1% | 341,022 | 0.9% | 7,020,196 | 17.9% | 39,140,386 | 100.0% |
| 2000 | 6,529,150 | 16.5% | 297,727 | 0.8% | 6,826,877 | 17.2% | 39,619,986 | 100.0% |
| 2001 | 5,767,020 | 14.4% | 294,232 | 0.7% | 6,061,252 | 15.1% | 40,025,724 | 100.0% |
| 2002 | 5,204,730 | 12.9% | 289,554 | 0.7% | 5,494,284 | 13.6% | 40,488,878 | 100.0% |
| 2003 | 4,989,723 | 12.1% | 334,378 | 0.8% | 5,324,101 | 13.0% | 41,086,981 | 100.0% |
| 2004 | 5,155,875 | 12.4% | 342,619 | 0.8% | 5,498,494 | 13.2% | 41,693,375 | 100.0% |
| 2005 | 5,763,537 | 13.6% | 514,931 | 1.2% | 6,278,468 | 14.8% | 42,342,234 | 100.0% |
| 2006 (d) | 7,175,096 | 16.6% | 402,104 | 0.9% | 7,577,200 | 17.5% | 43,252,055 | 100.0% |
| 2007 | 8,595,881 | 19.5% | 386,160 | 0.9% | 8,982,041 | 20.4% | 44,009,689 | 100.0% |
| 2008 | 9,933,379 | 21.8% | 349,697 | 0.8% | 10,283,076 | 22.6% | 45,517,331 | 100.0% |
| 2009 | 10,943,107 | 23.5% | 359,637 | 0.8% | 11,302,744 | 24.3% | 46,560,767 | 100.0% |

revised 04/28/2011

**Notes
:**

(a) All managed care enrollment numbers are based on December 31 of that year, unless otherwise noted.
The managed care enrollment are based on the report Monthly Managed Care Contract Summary report for years 1985-2005, (https://www.cms.gov/HealthPlanRepFileData/04_Monthly.asp)

(b) Total Medicare enrollment is based on the following report "Medicare Enrollment: National Trends 1966-2009" from the website http://www.cms.gov/MedicareEnRpts/Downloads/HISMI2009.pdf retrieved on 4/28/11. Enrollment figures as of July 1 of each year.

(c) In 1998, a cost-based plan (Health Care Prepayment Plan transitioned to a risk-based plan).

(d) Includes beneficiaries that enrolled in a managed care plan with Part D drug benefit and beneficiaries that are only enrolled in a managed care plan. Source: Monthly Summary Report - http://www.cms.hhs.gov/MCRAdvPartDEnrolData/MCESR/list.asp

Table 1.6 Demographic and Socioeconomic Characteristics of Noninstitutionalized Medicare Beneficiaries, by Insurance Coverage, 2004

Community Residents[1]

| Beneficiary Characteristic | Total | Medicare Risk HMO[2] | Medicaid | Supplemental Health Insurance | | | Medicare Fee-For-Service Only | Other |
| | | | | Individually-Purchased Private Insurance | Employer-Sponsored Private Insurance | Both Types of Private Insurance | | |
|---|---|---|---|---|---|---|---|---|
| Beneficiaries (in 000s) | 40,497 | 5,267 | 6,213 | 8,827 | 11,758 | 1,844 | 6,068 | 519 |
| **Beneficiaries as a Percent of Column Total** | | | | | | | | |
| **Income** | | | | | | | | |
| $5,000 or less | 4.32 | 3.03 | 12.05 | 2.40 | 1.70 | 1.70* | 6.07 | 6.05* |
| $5,001 - $10,000 | 15.87 | 12.81 | 57.27 | 7.95 | 3.89 | 0.68* | 15.36 | 18.12* |
| $10,001 - $15,000 | 16.40 | 19.42 | 21.35 | 17.65 | 9.85 | 5.25* | 21.50 | 33.70 |
| $15,001 - $20,000 | 11.67 | 15.08 | 6.28 | 14.09 | 10.46 | 5.92* | 14.08 | 19.81* |
| $20,001 - $25,000 | 10.65 | 11.77 | 1.22* | 11.67 | 13.32 | 11.80 | 12.39 | 9.79* |
| $25,001 - $30,000 | 9.35 | 10.01 | 0.40* | 10.75 | 12.47 | 14.77 | 8.63 | 4.24* |
| $30,001 - $35,000 | 6.23 | 7.29 | 0.51* | 6.62 | 9.11 | 8.79 | 4.47 | 3.58* |
| $35,001 - $40,000 | 6.34 | 5.93 | 0.27* | 7.30 | 9.62 | 8.04 | 4.97 | 2.24* |
| More than $40,000 | 19.17 | 14.66 | 0.65* | 21.56 | 29.58 | 43.15 | 12.53 | 2.47* |
| **Metropolitan Area Resident** | | | | | | | | |
| Yes | 76.44 | 98.31 | 71.94 | 69.97 | 76.54 | 82.37 | 69.88 | 71.72 |
| No | 23.56 | 1.69* | 28.06 | 30.03 | 23.46 | 17.63 | 30.12 | 28.28 |

Source: Medicare Current Beneficiary Survey

Note: Standard errors are shaded and in italics. See Appendix A for additional information on standard errors. See Appendix B for definitions of terms and variables.

1 The term *community residents* includes beneficiaries who resided only in the community during the year, and beneficiaries who resided part of the year in the community and part of the year in a long-term care facility. It excludes beneficiaries who resided only in a long-term care facility during the year.

2 HMO stands for Health Maintenance Organization.

3 Medicare beneficiaries with end-stage renal disease (ESRD) are included within the subgroups of "Aged" and "Disabled."

58

Table 1.6  Demographic and Socioeconomic Characteristics of Noninstitutionalized Medicare Beneficiaries, by Insurance Coverage, 2005 Community Residents[1]

| Beneficiary Characteristic | Total | Medicare Risk HMO[2] | Medicaid | Supplemental Health Insurance | | | Medicare Fee-For-Service Only | Other |
|---|---|---|---|---|---|---|---|---|
| | | | | Individually-Purchased Private Insurance | Employer-Sponsored Private Insurance | Both Types of Private Insurance | | |
| Beneficiaries (in 000s) | 41,119 | 5,348 | 6,197 | 9,281 | 11,950 | 1,907 | 5,972 | 465 |
| | *139* | | | | | *79* | *165* | *36* |
| **Beneficiaries as a Percent of Column Total** | | | | | | | | |
| **Income** | | | | | | | | |
| $5,000 or less | 3.89 | 3.36 | 10.12 | 2.28 | 1.87 | 1.00* | 5.37 | 3.61* |
| $5,001 - $10,000 | 15.17 | 11.90 | 55.97 | 6.82 | 3.58 | 0.65* | 15.73 | 25.70* |
| $10,001 - $15,000 | 16.53 | 19.84 | 24.40 | 17.47 | 9.68 | 3.72* | 21.03 | 25.18* |
| $15,001 - $20,000 | 11.30 | 14.86 | 6.10 | 13.98 | 9.41 | 6.29* | 14.36 | 16.25* |
| $20,001 - $25,000 | 10.71 | 11.94 | 1.60* | 12.28 | 13.38 | 12.15 | 10.40 | 16.23* |
| $25,001 - $30,000 | 9.11 | 10.09 | 0.80* | 10.76 | 11.67 | 11.14 | 8.82 | 5.31* |
| $30,001 - $35,000 | 6.43 | 6.75 | 0.23* | 7.11 | 8.73 | 8.44 | 6.53 | 3.35* |
| $35,001 - $40,000 | 6.52 | 6.14 | 0.18* | 7.25 | 9.74 | 10.95 | 4.71 | 2.95* |
| More than $40,000 | 20.35 | 15.13 | 0.59* | 22.07 | 31.94 | 45.66 | 13.05 | 1.41* |
| **Metropolitan Area Resident** | | | | | | | | |
| Yes | 76.06 | 97.74 | 72.70 | 70.00 | 75.06 | 82.43 | 69.89 | 70.85 |
| No | 23.94 | 2.26* | 27.30 | 30.00 | 24.94 | 17.57 | 30.11 | 29.15 |

Source:  Medicare Current Beneficiary Survey

Note:  Standard errors are shaded and in italics.  See Appendix A for additional information on standard errors.  See Appendix B for definitions of terms and variables.

1   The term *community residents* includes beneficiaries who resided only in the community during the year, and beneficiaries who resided part of the year in the community and part of the year in a long-term care facility.  It excludes beneficiaries who resided only in a long-term care facility during the year.
2   HMO stands for Health Maintenance Organization.
3   Medicare beneficiaries with end-stage renal disease (ESRD) are included within the subgroups of "Aged" and "Disabled."

**58**

Table 1.6 Demographic and Socioeconomic Characteristics of Noninstitutionalized Medicare Beneficiaries, by Insurance Coverage, 2006 Community Residents[1]

| Beneficiary Characteristic | Total | Medicare Risk HMO[2] | Medicaid | Supplemental Health Insurance | | | Medicare Fee-For-Service Only | Other |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Individually-Purchased Private Insurance | Employer-Sponsored Private Insurance | Both Types of Private Insurance | | |
| **Beneficiaries (in 000s)** | 41,599 | 7,523 | 5,899 | 8,479 | 11,283 | 1,914 | 6,158 | 344 |
| | *737* | *167* | *144* | *184* | *198* | *76* | *169* | *36* |
| **Living Arrangement** | | | | | | | | |
| Lives alone | 29.41 | 27.95 | 38.17 | 32.30 | 23.49 | 26.95 | 30.35 | 30.72* |
| | *0.39* | *1.09* | *1.22* | *0.77* | *0.73* | *1.82* | *1.04* | *3.12* |
| With spouse | 52.23 | 52.53 | 21.02 | 56.13 | 65.57 | 65.70 | 48.12 | 44.93 |
| | | *1.17* | *1.57* | *0.95* | *0.85* | *1.36* | *1.29* | *5.01* |
| With children | 10.10 | 11.92 | 18.36 | 7.32 | 6.75 | 4.17* | 11.55 | 14.19* |
| | *0.32* | *0.82* | *0.88* | *0.49* | *0.47* | *0.82* | *0.87* | *3.05* |
| With others | 8.26 | 7.60 | 22.44 | 4.24 | 4.18 | 3.18* | 9.98 | 10.16* |
| | *0.25* | *0.57* | *1.05* | *0.40* | *0.39* | *0.67* | *0.81* | *2.53* |
| **Race/Ethnicity** | | | | | | | | |
| White non-Hispanic | 78.24 | 70.36 | 54.75 | 91.48 | 85.74 | 92.29 | 74.95 | 62.12 |
| | *0.49* | *1.21* | *1.60* | *0.57* | *0.71* | *1.05* | *1.10* | *6.79* |
| Black non-Hispanic | 9.21 | 10.70 | 19.33 | 2.82 | 6.50 | 3.10* | 13.27 | 10.96* |
| | *0.19* | *0.60* | *1.04* | *0.32* | *1.00* | *0.70* | *0.90* | *3.11* |
| Hispanic | 7.88 | 14.96 | 15.51 | 2.83 | 4.28 | 1.96* | 7.20 | 9.41* |
| | *0.45* | *1.10* | *1.07* | *0.39* | *0.61* | *0.61* | *0.87* | *3.44* |
| Other | 4.67 | 3.97 | 10.41 | 2.87 | 3.47 | 2.65* | 4.59 | 17.51* |
| | *0.24* | *0.39* | *0.86* | *0.36* | *0.42* | *0.71* | *0.60* | *4.71* |
| **Schooling** | | | | | | | | |
| 0 - 8 years | 11.52 | 13.42 | 28.24 | 7.61 | 5.63 | 1.76* | 12.37 | 17.51* |
| | *0.30* | *0.83* | *1.06* | *0.48* | *0.42* | *0.47* | *0.79* | *3.93* |
| 9 - 12 years (no diploma) | 14.83 | 15.24 | 25.68 | 12.70 | 10.64 | 5.28* | 17.19 | 25.02* |
| | *0.33* | *0.81* | *0.99* | *0.77* | *0.68* | *2.19* | *1.13* | *4.99* |
| High school graduate | 30.89 | 30.59 | 25.15 | 34.48 | 32.03 | 24.14 | 31.76 | 31.68* |
| | *0.47* | *0.89* | *1.25* | *0.64* | *0.90* | *1.79* | *1.28* | *3.79* |
| Voc/tech/bus/etc. | 7.24 | 7.00 | 3.89 | 8.12 | 8.25 | 6.75* | 7.62 | 9.55* |
| | *0.24* | *0.56* | *0.46* | *0.59* | *0.62* | *1.06* | *0.60* | *2.46* |
| Some college | 15.33 | 16.91 | 9.59 | 15.59 | 16.71 | 17.69 | 15.47 | 9.45* |
| | *0.45* | *0.97* | *0.72* | *0.69* | *0.84* | *1.35* | *0.86* | *2.89* |
| Any college degree | 20.19 | 16.84 | 7.43 | 21.49 | 26.75 | 44.37 | 15.59 | 6.79* |
| | *0.52* | *0.90* | *0.71* | *0.95* | *0.97* | *2.32* | *0.97* | *2.59* |

**Table 1.6  Demographic and Socioeconomic Characteristics of Noninstitutionalized Medicare Beneficiaries, by Insurance Coverage, 2007 Community Residents[1]**

| Beneficiary Characteristic | Total | Medicare Risk HMO[2] | Medicaid | Supplemental Health Insurance | | | Medicare Fee-For-Service Only | Other |
|---|---|---|---|---|---|---|---|---|
| | | | | Individually-Purchased Private Insurance | Employer-Sponsored Private Insurance | Both Types of Private Insurance | | |
| Beneficiaries (in 000s) | 42,867 | 8,385 | 5,960 | 8,168 | 11,495 | 1,909 | 6,604 | 345 |
| | *725* | *181* | *197* | *145* | *175* | *93* | *103* | *32* |
| **Beneficiaries as a Percent of Column Total** | | | | | | | | |
| **Income[4]** | | | | | | | | |
| Less than $5,000 | 3.67 | 3.53 | 10.55 | 1.71 | 1.69 | 1.22* | 4.21 | 2.99* |
| | *0.26* | *0.34* | *0.77* | | *0.26* | *0.33* | *0.71* | |
| $5,000 - $9,999 | 12.68 | 12.79 | 48.28 | 5.11 | 2.30 | 1.34* | 10.87 | 17.08* |
| | | *0.67* | *1.33* | | | | | |
| $10,000 - $14,999 | 14.91 | 16.42 | 27.54 | 14.53 | 6.24 | 3.62* | 19.15 | 38.98* |
| | *0.34* | *0.69* | *1.20* | | | | | |
| $15,000 - $19,999 | 9.99 | 12.57 | 7.32 | 11.47 | 7.64 | 6.14* | 12.30 | 14.14* |
| | *0.29* | *0.75* | *0.71* | | | | *0.76* | |
| $20,000 - $24,999 | 9.24 | 11.09 | 2.59 | 10.39 | 9.34 | 6.67* | 11.77 | 14.11* |
| | *0.28* | *0.74* | *0.59* | | | *1.07* | *0.81* | |
| $25,000 - $29,999 | 8.64 | 8.28 | 1.67* | 10.69 | 11.08 | 8.90 | 8.84 | 2.38* |
| | *0.29* | *0.66* | | | | | | |
| $30,000 - $39,999 | 14.40 | 13.27 | 1.20* | 15.37 | 21.13 | 18.90 | 13.94 | 6.31* |
| | *0.36* | *0.64* | | | | | *0.99* | |
| $40,000 - $49,999 | 9.41 | 7.88 | 0.41* | 12.19 | 13.71 | 12.00 | 8.24 | 0.60* |
| | *0.27* | *0.84* | *0.31* | | | | | |
| $50,000 or more | 17.08 | 14.17 | 0.44* | 18.54 | 26.85 | 41.22 | 10.69 | 3.42* |
| | *0.44* | *0.76* | *0.14* | *0.66* | | | *0.92* | |
| **Metropolitan Area Resident** | | | | | | | | |
| Yes | 75.98 | 89.41 | 69.98 | 67.87 | 76.69 | 81.50 | 71.44 | 78.31 |
| | *0.26* | *0.59* | *1.04* | *0.83* | | | *1.49* | |
| No | 24.02 | 10.59 | 30.02 | 32.13 | 23.31 | 18.50 | 28.56 | 21.69* |
| | *0.26* | *0.59* | *1.04* | *0.83* | | | *1.49* | |

Source: Medicare Current Beneficiary Survey

Note:  Standard errors are shaded and in italics.  See Appendix A for additional information on standard errors.  See Appendix B for definitions of terms and variables.

1    The term *community residents* includes beneficiaries who resided only in the community during the year, and beneficiaries who resided part of the year in the community and part of the year in a long-term care facility.  It excludes beneficiaries who resided only in a long-term care facility during the year.

2    HMO stands for Health Maintenance Organization.

3    Medicare beneficiaries with end-stage renal disease (ESRD) are included within the subgroups of "Aged" and "Disabled."

4    Income estimates are derived from imputed income data.  Standard errors of income estimates may be underestimated as they have not been adjusted to reflect the imputation of missing data.

58

## Table 1.6 Demographic and Socioeconomic Characteristics of Noninstitutionalized Medicare Beneficiaries, by Insurance Coverage, 2009 Community Residents[1]

| Beneficiary Characteristic | Total | Medicare Risk HMO[2] | Medicaid | Supplemental Health Insurance | | | Medicare Fee-For-Service Only | Other |
|---|---|---|---|---|---|---|---|---|
| | | | | Individually-Purchased Private Insurance | Employer-Sponsored Private Insurance | Both Types of Private Insurance | | |
| Beneficiaries (in 000s) | 45,053 | 11,273 | 6,667 | 5,784 | 11,727 | 7,937 | 1,359 | 306 |
| | *784* | *207* | *211* | *142* | *283* | *181* | *81* | |
| **Income[4]** | | | | | | | | |
| Less than $5,000 | 3.43 | 3.05 | 11.08 | 2.09 | 1.24* | 1.25* | 3.34 | 2.78* |
| | *0.10* | *0.39* | *0.92* | | | | *0.62* | *1.33* |
| $5,000 - $9,999 | 10.88 | 10.48 | 43.02 | 4.96 | 1.99 | 1.63* | 8.27 | 9.69* |
| | *0.37* | *0.58* | *1.70* | *0.60* | | *0.28* | *0.93* | *3.42* |
| $10,000 - $14,999 | 13.53 | 15.84 | 30.57 | 11.13 | 4.70 | 2.81* | 14.79 | 26.93* |
| | *0.33* | *0.71* | *1.19* | *0.90* | *0.41* | *1.00* | *0.97* | *3.65* |
| $15,000 - $19,999 | 9.96 | 12.47 | 8.45 | 9.79 | 6.68 | 4.33* | 13.13 | 30.96* |
| | *0.27* | *0.51* | *0.96* | *0.73* | *0.50* | *1.02* | *1.01* | |
| $20,000 - $24,999 | 9.19 | 11.16 | 3.29 | 12.20 | 7.64 | 6.75* | 10.49 | 11.49* |
| | *0.28* | *0.59* | *0.43* | *0.72* | *0.58* | *0.91* | *0.93* | |
| $25,000 - $29,999 | 9.07 | 10.16 | 1.67* | 10.28 | 9.66 | 9.80* | 10.87 | 12.05* |
| | *0.34* | *0.55* | *0.36* | *0.73* | *0.76* | *1.28* | *0.97* | |
| $30,000 - $39,999 | 13.73 | 13.86 | 1.40* | 15.78 | 17.90 | 13.10 | 15.02 | 4.38* |
| | *0.32* | *0.55* | *0.31* | *0.82* | *0.74* | | *0.93* | |
| $40,000 - $49,999 | 10.02 | 8.66 | 0.23* | 10.91 | 15.41 | 18.68 | 8.89 | 1.24* |
| | *0.38* | *0.49* | *0.12* | *0.89* | *0.94* | *1.58* | *0.88* | |
| $50,000 or more | 20.20 | 14.32 | 0.28* | 22.85 | 34.78 | 41.64 | 15.17 | 0.49* |
| | *0.60* | *0.69* | *0.12* | *1.21* | *1.12* | *2.16* | *1.20* | |
| **Metropolitan Area Resident** | | | | | | | | |
| Yes | 76.43 | 87.45 | 68.82 | 69.42 | 77.27 | 80.87 | 70.69 | 69.81 |
| | *0.91* | *1.08* | *1.77* | *3.01* | *3.03* | *2.05* | *5.51* | |
| No | 23.57 | 12.55 | 31.18 | 30.58 | 22.73 | 19.13 | 29.31 | 30.19* |
| | *0.91* | *1.05* | *1.77* | *1.01* | *1.03* | *2.05* | *1.51* | |

Source: Medicare Current Beneficiary Survey

Note: Standard errors are shaded and in italics. See Appendix A for additional information on standard errors. See Appendix B for definitions of terms and variables.

1 The term *community residents* includes beneficiaries who resided only in the community during the year, and beneficiaries who resided part of the year in the community and part of the year in a long-term care facility. It excludes beneficiaries who resided only in a long-term care facility during the year.

2 HMO stands for Health Maintenance Organization.

3 Medicare beneficiaries with end-stage renal disease (ESRD) are included within the subgroups of "Aged" and "Disabled."

4 Income estimates are derived from imputed income data. Standard errors of income estimates may be underestimated as they have not been adjusted to reflect the imputation of missing data.

54

Table 1.6 Demographic and Socioeconomic Characteristics of Noninstitutionalized Medicare Beneficiaries, by Insurance Coverage, 2008 Community Residents[1]

| Beneficiary Characteristic | Total | Medicare Risk HMO[2] | Medicaid | Supplemental Health Insurance | | | Medicare Fee-For-Service Only | Other |
|---|---|---|---|---|---|---|---|---|
| | | | | Individually-Purchased Private Insurance | Employer-Sponsored Private Insurance | Both Types of Private Insurance | | |
| Beneficiaries (in 000s) | 43,906 | 9,331 | 5,972 | 8,240 | 11,741 | 1,524 | 6,736 | 361 |
| | *149* | *203* | *169* | *163* | | *38* | *203* | |
| **Beneficiaries as a Percent of Column Total** | | | | | | | | |
| **Income[4]** | | | | | | | | |
| Less than $5,000 | 3.43 | 2.98 | 10.57 | 1.86 | 1.39 | 0.63* | 3.88 | 2.95* |
| | *0.22* | *0.29* | *0.85* | *0.33* | | *0.16* | | |
| $5,000 - $9,999 | 11.72 | 10.70 | 47.44 | 4.91 | 1.92 | 1.10* | 9.23 | 12.13* |
| | *0.36* | *0.73* | *1.35* | *0.33* | | *0.38* | *0.73* | |
| $10,000 - $14,999 | 14.02 | 15.14 | 28.47 | 12.97 | 5.37 | 2.30* | 17.77 | 31.40* |
| | *0.30* | *0.77* | *1.21* | *0.62* | | | *0.90* | |
| $15,000 - $19,999 | 9.75 | 12.25 | 7.43 | 11.51 | 6.54 | 3.72* | 12.68 | 18.87* |
| | *0.30* | *0.60* | *0.63* | *0.68* | | | | |
| $20,000 - $24,999 | 9.55 | 11.81 | 2.85 | 10.70 | 9.17 | 6.73* | 11.79 | 17.58* |
| | *0.33* | *0.73* | *0.61* | *0.67* | | | | |
| $25,000 - $29,999 | 9.06 | 11.01 | 1.74* | 9.69 | 10.62 | 7.60* | 9.82 | 7.34* |
| | *0.25* | *0.74* | *0.38* | *0.51* | | | | |
| $30,000 - $39,999 | 13.85 | 13.64 | 0.79* | 15.81 | 19.32 | 18.11 | 13.25 | 5.67* |
| | *0.33* | *0.74* | *0.22* | *0.71* | | | | |
| $40,000 - $49,999 | 9.19 | 7.58 | 0.36* | 10.37 | 13.84 | 13.85 | 8.97 | 3.21* |
| | *0.31* | *0.56* | *0.14* | | | | | |
| $50,000 or more | 19.42 | 14.90 | 0.35* | 22.19 | 31.82 | 46.95 | 12.61 | 0.86* |
| | *0.47* | *0.74* | *0.13* | | *0.97* | *3.0* | *1.02* | |
| **Metropolitan Area Resident** | | | | | | | | |
| Yes | 76.10 | 88.50 | 68.39 | 69.13 | 76.88 | 82.12 | 71.39 | 79.81 |
| | *0.27* | *0.97* | *1.47* | *1.04* | *0.97* | *1.77* | *1.41* | *3.9* |
| No | 23.90 | 11.50 | 31.61 | 30.87 | 23.12 | 17.88 | 28.61 | 20.19* |
| | *0.27* | *0.97* | *1.47* | *1.04* | *0.97* | *1.79* | *1.41* | *3.9* |

Source: Medicare Current Beneficiary Survey

Note:   Standard errors are shaded and in italics.   See Appendix A for additional information on standard errors.   See Appendix B for definitions of terms and variables.

1   The term *community residents* includes beneficiaries who resided only in the community during the year, and beneficiaries who resided part of the year in the community and part of the year in a long-term care facility.  It excludes beneficiaries who resided only in a long-term care facility during the year.
2   HMO stands for Health Maintenance Organization.
3   Medicare beneficiaries with end-stage renal disease (ESRD) are included within the subgroups of "Aged" and "Disabled."
4   Income estimates are derived from imputed income data.   Standard errors of income estimates may be underestimated as they have not been adjusted to reflect the imputation of missing data.

Table 1.6  Demographic and Socioeconomic Characteristics of Noninstitutionalized Medicare Beneficiaries, by Insurance Coverage, 2010 Community Residents[1]

| Beneficiary Characteristic | Total | Medicare Risk HMO[2] | Medicaid | Supplemental Health Insurance | | | Medicare Fee-For-Service Only | Other |
|---|---|---|---|---|---|---|---|---|
| | | | | Individually-Purchased Private Insurance | Employer-Sponsored Private Insurance | Both Types of Private Insurance | | |
| Beneficiaries (in 000s) | 46,270 | 11,948 | 6,099 | 7,878 | 11,796 | 1,195 | 7,089 | 265 |
| | | | | Beneficiaries as a Percent of Column Total | | | | |
| Income[4] | | | | | | | | |
| Less than $5,000 | 3.65 | 3.61 | 12.83 | 1.73* | 0.92* | 0.90* | 2.95 | 4.06* |
| $5,000 - $9,999 | 10.41 | 10.41 | 40.00 | 4.32 | 1.89 | 0.37* | 7.73 | 6.95* |
| $10,000 - $14,999 | 13.58 | 14.86 | 31.58 | 10.31 | 4.13 | 2.77* | 16.69 | 26.93* |
| $15,000 - $19,999 | 10.05 | 13.37 | 8.77 | 10.44 | 5.90 | 3.55* | 12.78 | 19.62* |
| $20,000 - $24,999 | 8.69 | 10.26 | 3.21 | 9.86 | 8.15 | 7.54* | 10.33 | 13.94* |
| $25,000 - $29,999 | 8.20 | 8.63 | 1.27* | 10.82 | 9.22 | 7.87* | 8.75 | 11.88* |
| $30,000 - $39,999 | 13.84 | 14.57 | 1.29* | 16.40 | 17.48 | 16.56 | 14.28 | 8.14* |
| $40,000 - $49,999 | 10.16 | 8.84 | 0.46* | 11.88 | 15.26 | 11.89* | 10.32 | 2.10* |
| $50,000 or more | 21.42 | 15.44 | 0.59* | 24.24 | 37.05 | 48.54 | 16.27 | 6.38* |
| Metropolitan Area Resident | | | | | | | | |
| Yes | 76.47 | 87.35 | 69.98 | 67.75 | 77.50 | 81.42 | 71.16 | 69.39 |
| No | 23.53 | 12.65 | 30.02 | 32.25 | 22.50 | 18.58 | 28.84 | 30.61* |

Source:  Medicare Current Beneficiary Survey

Note:   Standard errors are shaded and in italics.   See Appendix A for additional information on standard errors.   See Appendix B for definitions of terms and variables.

1   The term *community residents* includes beneficiaries who resided only in the community during the year, and beneficiaries who resided part of the year in the community and part of the year in a long-term care facility.  It excludes beneficiaries who resided only in a long-term care facility during the year.

2   HMO stands for Health Maintenance Organization.

3   Medicare beneficiaries with end-stage renal disease (ESRD) are included within the subgroups of "Aged" and "Disabled."

4   Income estimates are derived from imputed income data.   Standard errors of income estimates may be underestimated as they have not been adjusted to reflect the imputation of missing data.

54

Table 1.6  Demographic and Socioeconomic Characteristics of Noninstitutionalized Medicare Beneficiaries, by Insurance Coverage, 2011 Community Residents[1]

| Beneficiary Characteristic | Total | Medicare Risk HMO[2] | Medicaid | Supplemental Health Insurance | | | Medicare Fee-For-Service Only | Other |
|---|---|---|---|---|---|---|---|---|
| | | | | Individually-Purchased Private Insurance | Employer-Sponsored Private Insurance | Both Types of Private Insurance | | |
| Beneficiaries (in 000s) | 47,969 | 13,045 | 6,558 | 8,180 | 11,504 | 1,131 | 7,280 | 292 |
| | *749* | *210* | *153* | *153* | *242* | *76* | *197* | *38* |

Beneficiaries as a Percent of Column Total

| Beneficiary Characteristic | Total | Medicare Risk HMO[2] | Medicaid | Individually-Purchased Private Insurance | Employer-Sponsored Private Insurance | Both Types of Private Insurance | Medicare Fee-For-Service Only | Other |
|---|---|---|---|---|---|---|---|---|
| **Income[4]** | | | | | | | | |
| Less than $5,000 | 3.01 | 2.54 | 10.74 | 1.03* | 0.08* | 0.18* | 2.92 | 2.92* |
| | *0.09* | *0.31* | *0.73* | *0.24* | *0.18* | *0.17* | *0.43* | *1.78* |
| $5,000 - $9,999 | 10.39 | 10.43 | 39.64 | 3.22 | 1.13* | 0.82* | 8.08 | 12.49* |
| | *0.36* | *0.82* | *1.29* | *0.39* | *0.22* | *0.41* | *0.73* | *3.40* |
| $10,000 - $14,999 | 13.35 | 14.39 | 31.97 | 9.84 | 3.40 | 2.01* | 15.66 | 25.25* |
| | *0.31* | *0.80* | *1.24* | *0.76* | *0.33* | *0.81* | *1.02* | *5.78* |
| $15,000 - $19,999 | 9.42 | 12.36 | 10.47 | 9.37 | 5.18 | 2.06* | 10.65 | 20.78* |
| | *0.26* | *0.78* | *0.76* | *0.82* | *0.38* | *0.78* | *0.69* | *4.82* |
| $20,000 - $24,999 | 9.21 | 10.97 | 3.83 | 10.63 | 8.42 | 4.87* | 10.90 | 17.11* |
| | *0.26* | *0.91* | *0.61* | *0.75* | *0.59* | *1.26* | *0.79* | *5.02* |
| $25,000 - $29,999 | 8.08 | 8.66 | 1.34* | 10.26 | 8.50 | 8.10* | 9.96 | 9.22* |
| | *0.26* | *0.81* | *0.25* | *0.69* | *0.58* | *1.67* | *0.87* | *3.41* |
| $30,000 - $39,999 | 13.50 | 14.17 | 1.32* | 16.73 | 16.41 | 16.97 | 14.75 | 7.84* |
| | *0.38* | *0.78* | *0.30* | *0.83* | *0.76* | *3.24* | *0.98* | *4.02* |
| $40,000 - $49,999 | 10.26 | 9.95 | 0.22* | 11.64 | 15.55 | 13.94 | 9.69 | 1.76* |
| | *0.29* | *0.62* | *0.10* | *0.71* | *0.67* | *3.20* | *0.81* | *1.76* |
| $50,000 or more | 22.79 | 16.54 | 0.49* | 27.29 | 40.52 | 51.05 | 17.39 | 2.62* |
| | *0.50* | *0.72* | *0.16* | *1.14* | *0.96* | *3.10* | *1.02* | *1.50* |
| **Metropolitan Area Resident** | | | | | | | | |
| Yes | 76.65 | 86.77 | 69.63 | 67.76 | 78.47 | 80.84 | 71.12 | 80.90 |
| | *0.25* | *0.61* | *1.10* | *0.92* | *0.83* | *2.30* | *0.95* | *3.77* |
| No | 23.35 | 13.23 | 30.37 | 32.24 | 21.53 | 19.16 | 28.88 | 19.10* |
| | *0.25* | *0.61* | *1.10* | *0.92* | *0.83* | *2.30* | *0.95* | *3.77* |

Source:  Medicare Current Beneficiary Survey

Note:  An * indicates a sample size of 50 or less.  Standard errors are shaded and in italics.  See Appendix A for additional information on standard errors.  See Appendix B for definitions of terms and variables.

1   The term community residents includes beneficiaries who resided only in the community during the year, and beneficiaries who resided part of the year in the community and part of the year in a long-term care facility.  It excludes beneficiaries who resided only in a long-term care facility during the year.
2   HMO stands for Health Maintenance Organization.
3   Medicare beneficiaries with end-stage renal disease (ESRD) are included within the subgroups of "Aged" and "Disabled."
4   Income estimates are derived from imputed income data.  Standard errors of income estimates may be underestimated as they have not been adjusted to reflect the imputation of missing data.

54

Table 1.6  Demographic and Socioeconomic Characteristics of Noninstitutionalized Medicare Beneficiaries, by Insurance Coverage, 2012 Community Residents[1]

| Beneficiary Characteristic | Total | Medicare Risk HMO[2] | Medicaid | Individually-Purchased Private Insurance | Employer-Sponsored Private Insurance | Both Types of Private Insurance | Medicare Fee-For-Service Only | Other |
|---|---|---|---|---|---|---|---|---|
| | | | | Supplemental Health Insurance | | | | |
| Beneficiaries (in 000s) | 51,037 *(87)* | 14,348 *(228)* | 6,776 *(170)* | 8,268 *(191)* | 12,017 *(270)* | 1,129 *(90)* | 8,243 *(214)* | 257 *(36)* |
| | | | | Beneficiaries as a Percent of Column Total | | | | |
| Income[4] | | | | | | | | |
| Less than $5,000 | 2.67 *(0.18)* | 2.24 *(0.27)* | 8.74 *(0.76)* | 1.16* *(0.18)* | 1.10* *(0.22)* | 1.24* *(0.31)* | 2.31 *(0.40)* | 5.57* *(3.22)* |
| $5,000 - $9,999 | 9.14 *(0.27)* | 9.07 *(0.49)* | 37.69 *(1.35)* | 2.18 *(0.41)* | 1.05* *(0.20)* | 0.63* *(0.37)* | 5.83 *(0.64)* | 5.94* *(3.02)* |
| $10,000 - $14,999 | 13.16 *(0.26)* | 15.07 *(0.74)* | 32.82 *(1.40)* | 7.63 *(0.63)* | 3.20 *(0.31)* | 1.97* *(0.70)* | 14.72 *(1.01)* | 31.05* *(7.32)* |
| $15,000 - $19,999 | 9.41 *(0.26)* | 11.32 *(0.61)* | 11.90 *(0.80)* | 9.46 *(0.68)* | 4.83 *(0.37)* | 2.74* *(0.79)* | 11.22 *(0.79)* | 21.29* *(4.99)* |
| $20,000 - $24,999 | 9.89 *(0.31)* | 12.22 *(0.63)* | 4.86 *(0.67)* | 10.99 *(0.59)* | 7.02 *(0.45)* | 4.73* *(1.14)* | 13.45 *(1.04)* | 20.89* *(9.20)* |
| $25,000 - $29,999 | 8.10 *(0.31)* | 9.57 *(0.55)* | 1.57* *(0.32)* | 9.47 *(0.88)* | 8.10 *(0.44)* | 5.35* *(1.15)* | 10.14 *(0.83)* | 1.16* *(1.11)* |
| $30,000 - $39,999 | 12.68 *(0.38)* | 13.03 *(0.66)* | 1.13* *(0.24)* | 15.01 *(0.81)* | 16.59 *(0.68)* | 13.34* *(2.15)* | 13.67 *(0.93)* | 5.55* *(3.93)* |
| $40,000 - $49,999 | 9.77 *(0.29)* | 9.54 *(0.54)* | 0.30* *(0.13)* | 13.14 *(0.88)* | 13.36 *(0.67)* | 14.89* *(3.74)* | 8.83 *(0.87)* | 4.31* *(2.40)* |
| $50,000 or more | 25.18 *(0.61)* | 17.94 *(0.89)* | 1.00* *(0.30)* | 30.97 *(1.28)* | 44.76 *(1.10)* | 55.11 *(4.37)* | 19.84 *(1.62)* | 4.24* *(2.65)* |
| Metropolitan Area Resident | | | | | | | | |
| Yes | 77.04 *(0.31)* | 85.68 *(0.67)* | 71.49 *(1.24)* | 67.59 *(1.07)* | 79.27 *(0.76)* | 81.12 *(2.93)* | 72.02 *(1.10)* | 84.75 *(5.20)* |
| No | 22.96 *(0.31)* | 14.32 *(0.67)* | 28.51 *(1.24)* | 32.41 *(1.07)* | 20.73 *(0.76)* | 18.88 *(2.93)* | 27.98 *(1.10)* | 15.25* *(5.20)* |

Source: Medicare Current Beneficiary Survey

Note: An * indicates a sample size of 50 or less.  Standard errors are shaded and in italics.  See Appendix A for additional information on standard errors. See Appendix B for definitions of terms and variables.

1  The term *community residents* includes beneficiaries who resided only in the community during the year, and beneficiaries who resided part of the year in the community and part of the year in a long-term care facility.  It excludes beneficiaries who resided only in a long-term care facility during the year.
2  HMO stands for Health Maintenance Organization.
3  Medicare beneficiaries with end-stage renal disease (ESRD) are included within the subgroups of "Aged" and "Disabled."
4  Income estimates are derived from imputed income data.  Standard errors of income estimates may be underestimated as they have not been adjusted to reflect the imputation of missing data.

54

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop S2-26-12
Baltimore, Maryland   21244-1850



Office of Information Products and Data Analytics

July 23, 2013

Re: Income Variable

The Medicare Current Beneficiary Survey (MCBS) staff recently discovered a data anomaly
present in a categorical INCOME variable, impacting the *Characteristics and Perceptions of the
Medicare Population* data tables from 2006-2011.

In 2006, the collection of income data in the community setting changed from an 11-category
variable to a less granular 9-category variable.  Recently it was discovered that CMS' program
that used these data did not adequately correct for the category changes.  There was significant
overreporting of incomes in the $30,000 to $39,000 and $40,000 to $49,999 categories and
significant underreporting of incomes in the $50,000 or more range.  There were insignificant
changes in the lower income ranges.  **As a result, income was systematically underreported in
the *Characteristics and Perceptions of the Medicare Population* 2006-2011 files for
community survey participants.**  The impact is similar across all affected years.

All data tables containing income information have been corrected and rerun.